In The United States District Court
For The District of Delaware

Charles F. Cardone,
        Petitioner,

        V.

Thomas Carroll, Warden,
and Carl C. Danberg,
Attorney General of the
State of Delaware,
        Respondents

Civil Action

NO. 06-127-KAJ

FILED

JUL 19 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

BD Scanned

ANSWER

This ANSWER is a continuation of Petitioner's
clarification and correction to the numerous mis-
representations to the Court by respondents
in maligning the enclosed known facts as evidence
by the transcripts and other informations petitioner
makes available to the Court in the enclosed docu-
ments. The date of this ANSWER is July 12, 2006.
the date of petitioner's first ANSWER is July 6,
2006. the retrieval, gathering, and making copies
of these enclosed documents to make available to the
Court to support petitioner's writ of habeas corpus
and to controvert respondents attempts to subvert
the truths found in these transcripts and documents
has taken petitioner the good part of a year. Further-
more, petitioner is still unable to produce the pre-
liminary hearing transcripts, and the pre-trial

Petitioner's Answer 06-127 KAJ, 7-12-06
                                              DATE

transcripts of March 28, 2005, in which petitioner
notifies the trial judge (Graves) of the ineffective
assistance of counsel (IAC) & Charles F. Cardone,
have asserted in the § 2254. the following is the
petitioner's continuation and rebuttal of re-
spondent's assertions:

1. McFarlan states in her June 29, 2006, ANSWER,
on page 2 of her Facts "Cardone urinated
in the parkling lot".... on page 26 of the en-
closed March 28, 2005 trial transcript, the ~~trial~~
prosecutor, Ms. Ryan states at ⑬ ... "and
urinated in the parking lot." Yet, the state's witness,
Boyer, at ~~3~~ page 34 at ⑤ ⑥ and ⑦ states "No, I
didn't." Ms Ryan, petitioner points out to the
Court, knowingly introduces her malicious pros-
ecution by calling Boyer to the stand knowing
that her witness will ~~state~~ to the jury she did not
see me urinate. thus, the begining, by the State,
of violating my due process rights protected by the
Delaware State Constitution as well as our U.S. Con-
~~stitution~~ ...
2. On page 35 of the trial transcript, Ms. Ryan

3

Petitioner's ANSWER O6-127-KAJ, 7-12-06
DATE

illicits further direct examination testimony from
the officer who responded to the call from Royal
Farms, that the clerk at Royal Farms said to patrolman
Judson that I "urinated outside in the parking
lot." At that point, Ms Ryan again uses testimony at
⑯⑰⑱⑲ of page 35 that the clerk, on page 34
at ⑤⑥&⑦ states "No, I didn't..."

                                    , TRIAL TRANSCRIPT,
3. On pages 22, 23, 24, & and 25, Ryan misrepresents
to the Court by telling the trial judge that she
will present evidence of me urinating in the
parking lot... an event that was not witnessed...
to put in context the event I was charged with.
Ryan knowingly, and with the intent of malicious
prosecution, introduced to the Grand Jury and
the at trial jury, ~~testimony~~ evidence of her own
choosing (lies) to get an indictment and a trial
conviction of me. — At this point, allow me to state
that I may not argue about the truthfulness of testimony
or the importance of a piece of evidence, I may only chal-
lenge how the law was applied in relation to that test-
imony or evidence ... the appellate process reviews errors of
law, not errors in the facts of the case. I have, since my
trial, found out that Ms. Ryan deliberately withheld ex-
culpatory information (in my instance, Boyer admitted on the
⟶

Petitioner's  ANSWER - 06-127-KAJ - 7-12-06

DATE

4

stand that she did not witness me urinating... this
shows and proves that Ryan deliberately was inserting
plain error into the discovery process and my attorney did
not vigorously defend me by not compelling Ryan to disclose
Boyer's untruthfulness while dialing 911 to report my
public urination. Ryan, Graves, Abram, colluded to cause
highly prejudicial errors that affected my substantial
rights, and, to leave these issues unaddressed would
cause a serious miscarriage of justice....

4. In McFarlan's Facts[2], page 2 of her June 29, 2006
ANSWER which the Court should have in their possess-
ion and that I have provided, McFarlan states "but
Cardone reached into his pocket and pulled out a
pocketknife", that is not true. Now, in the full and
complete transcript I have enclosed and provided for
the Court's consideration, when Ryan displays the
surveillance tape in court starting on page 56 and
continuing to and ending on page 85,... Ryan starts
the surveillance tape on page 61 of the enclosed
complete trial transcripts to show to the jury and the
victim and witness and me entering the Royal Farms
store... Ryan shows bits and pieces of this surveillance
tape just as she and my attorney, Abram, have pro-
vided bits and pieces of and excerpts of trial tran-
scripts to the state courts (Superior and Delaware

Petitioner's ANSWER - O6-127- July 12,06
DATED

<u>5</u> .

Supreme Courts) for the purposes of supporting
the prosecutorial misconduct and ineffective assistance
of counsel, respectively. Also, to support my allega -
tions and charges of malicious prosecution and collusion
on the part of Ryan, Abram, and Graves...

5. McFarlan further states in her Facts, on page
3 of her ANSWER, that I resisted arrest and a small
pocketknife was found on me through a pat-down
serch... the only truth in the above was a small
knife was found. Yes, a small knife was found (
it was a gadget tool approx 1 inch in length, closed.)
On page 51 of the trial transcript, Abram asked the
State's witness, Taylor, "Did you see MR. Cardone
physically resisting the police?"... Taylor says I
shrugged my shoulder... next, Abram asks Taylor
if I was violent in any way... she (Taylor) asnwers
"I don't think so, no."

of her ANSWER
6. McFarlan, on pages 3,4,5,6,7, and 8, it is evident
that respondent's counsel has received docketed
documents and paperwork from petitioner... the problem
petitioner has is I have, repeatedly, requested Clerk
of the District Court to send me a copy of every
document and/or paperwork so I may know what
the Court has in their possession of the numerous

⟶

Petitioner's ANSWER - 06-127-KAS  7-12-2006
                                          DATED

<u>6</u>

documents and papers I have sent. I have asked
the Clerks to send me a bill so I may pay for
these papers (or, request the State to pay), only to
be denied, repeatedly, by the Clerk.
     On pages 3,4,5,6,7, and 8 of McFarlan's
ANWER, (of her DISCUSSION) she states "Here,
Cardone has not presented any of his claims to the
state supreme court." I, Charles F. Cardone, are am
stating, again, that my court appointed attorney (ap-
pointed by Graves) Michael ABRAM, has denied
my numerous requests (by certified and registered
mail) to raise my stated claims in Abram's
Rule 26 direct appeal to the Delaware Supreme Court.
Abram's denial is one of the grounds I have
raised in my petition for writ of habeas corpus.
Petitioner now has submits proof to the Court
of my claims of prosecutorial misconduct, malicious
prosecution, numerous violations of my due process
rights under State and U.S. Constitutional guarantees
and requests of the Delaware District Court, again,
to grant my § 2254. In the Court's granting of
§ 2254, I am demanding immediately release from
custody of DOC, the suspension/or revocation
of the licenses to practice law of Paula Ryan,
Michael Abrom of Ed. Gill's office, T. Henley
Graves .. and the awarding of one million dollars
to me, Charles F. Cardone, in compensatory, ⟶

7

Petition's ANSWER - 06-127-KAJ - 7-12-06
DATED

1

punitive damages and other reliefs and/or
damages deemed appropriate by the Court.

Charles F. Cardone
Petitioner
06-127-KAJ

12
Dated: July 13, 2006

Certificate of Service

I, Charles F. Cardone, hereby certify under penalty of perjury that a true and correct copy of this ANSWER to the response by respondent's to my petition for a writ of habeas corpus in Civil Action No. 06-127-KAJ- Dated July 13, 2006, has been provided to the below-listed parties by placing said ANSWER in a postage paid envelope and mailing said envelope via United States mail this 16 day of July, 2006 to:

Elizabeth R. McFarlan
Deputy Attorney General
Dept. of Justice
820 N. French St.
Wilmington, DE 19801

* Service to include tran-
script of proceedings on
March 28, 2005... cfc
July 16, 06

by:
Charles F. Cardone
Petitioner
SBI #098159
DCC
1181 Paddock Rd.
Smyrna, DE

19977

LEGAL MAIL

/IM Charles Z. Cardone
SBI# 098159   UNIT SHU(T)C4+

DELAWARE CORRECTIONAL CENTER

1181 PADDOCK ROAD

SMYRNA, DELAWARE 19977

* Judge's Chambers, Kent A. Jordan

U.S. District Court
844 N. King St.
Wilmington   DE
                    19801-3570

D.1, 17

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

**CHARLES F. CARDONE,**            :
                                   :
   Petitioner,     :
                                   :
v.                                 :  Civ. Act. No. 06-127-KAJ
                                   :
**THOMAS L. CARROLL,**             :
Warden, and **CARL C. DANBERG,**   :
Attorney General for the State of Delaware, :
                                   :
   Respondents.    :

## ANSWER

  Pursuant to Rule 5 of the Rules Governing Section 2254 Actions, 28 U.S.C. foll. § 2254,

respondents state the following in response to the petition for a writ of habeas corpus:

  On September 7, 2004, the petitioner, Charles Cardone, was arrested, and he was

subsequently indicted on charges of possession of a firearm during the commission of a felony,

possession of a deadly weapon by a person prohibited, aggravated menacing, resisting arrest, and

third degree criminal trespass. *See* Del. Super. Ct. Crim. Dkt. Items 1 & 2 in case no.

0409005091A. Cardone was also charged with violating his probation. *See* Del. Super. Ct.

Crim. Dkt. in case no. 0201021864. The person prohibited charge was severed prior to trial. *See*

Del. Super. Ct. Crim. Dkt. Item 27 in case no. 0409005091A. In March 2005, a Delaware

Superior Court jury found Cardone not guilty of possession of a firearm during the commission

of a felony, but guilty of aggravated menacing, resisting arrest and criminal trespassing.

*Cardone v. State*, 2006 WL 686588, *1 (Del. Mar. 17, 2006). After a hearing in Superior Court

on July 29, 2005, the Superior Court found that Cardone had violated the terms of his probation

with respect to prior convictions for third degree and second degree assault. *See* Del. Super. Ct.

Crim. Dkt. Item 75 in case no. 0201021864. Cardone was sentenced to an aggregate (including his violation of probation sentence) of 14 years at Level V incarceration, suspended after successful completion of a substance abuse program for Level IV supervision, suspended in turn after successful completion of another substance abuse program for Level III supervision. Cardone appealed from his March 2005 conviction and sentence. *See* Del. Super. Ct. Crim. Dkt. Item 64 in case no. 0409005091A. On February 23, 2006, Cardone applied for federal habeas relief.[1] D.I. 1. The Delaware Supreme Court subsequently affirmed his conviction and sentence. *Cardone v. State*, 2006 WL 686588 (Del. Mar. 17, 2006).

## Facts[2]

On September 6, 2004, Cardone spoke with an employee of the Royal Farms store in Rehoboth Beach, Delaware, and asked to use the bathroom. B1-2.[3] When informed by the clerk that the bathroom was not for public use, Cardone urinated in the parking lot. B2-3. A police officer responded to the scene, issued Cardone a summons, and informed him that the management of Royal Farms did not want Cardone ever to return. B3-7.

The next evening, Cardone returned to the Royal Farms store and confronted a different clerk. B12-13. Cardone became hostile as he described the incident the night before, and asked the clerk, Letez Hudson, whether he had called the police. B13-14. Hudson told Cardone that he had not been working that night, but Cardone reached into his pocket and pulled out a pocketknife. B14. Fearing that Cardone might stab him with the knife, Hudson backed away

---

[1] *See Longenette v. Krusing*, 322 F.3d 758, 761 (3d Cir. 2003) (a prisoner's petition is considered filed on the date he delivers it to prison officials for mailing); *Burns v. Morton*, 134 F.3d 109, 111 (3d Cir. 1998). Cardone's petition is dated February 23, 2006, and that is presumed to be the date he turned it over to correctional officers for mailing. *See Woods v. Kearney*, 215 F. Supp. 2d 458, 460 (D. Del. 2002).

[2] These facts are taken from the *State's Answering Brief* in Del. Supr. No. 375, 2005.

[3] References to "B" refer to the appendix to the *State's Answering Brief* in Del. Supr. No. 375, 2005.

2

and called 911 on his cell phone. B15-18. Cardone waved the knife in his hand, but then he left and went across the traffic circle to the 7-Eleven store. B8, 19-24, 28.

Cardone was standing in the coffee aisle of the 7-Eleven when the police arrived. B8. Officer Tyler Whitman repeatedly asked Cardone to put down his coffee cup and remove the headphones he was wearing. B8-9. Cardone appeared to ignore the officer. B27-29. Finally, Whitman knocked the headphones off Cardone's head and again asked him to put down his coffee cup. B9, 30. When Cardone did not comply, Whitman pushed the coffee out of the way, and instructed Cardone to keep his hands in the air, away from his pockets. B10. When Cardone tried to lower his hands, Whitman grabbed his arm and attempted to handcuff him. B10-11, 29. Cardone struggled and tried to pull away, but was eventually handcuffed and, with the assistance of two other officers, escorted out of the store. B27, 29-30. A pat-down search revealed a small pocketknife in Cardone's pants' pocket. B25-26, 31-33.

## Discussion

In his petition for federal habeas relief, Cardone raises two grounds for relief: (1) his due process rights were violated by the failure of his court-appointed attorney to provide Cardone with transcripts of all court proceedings; and (2) ineffective assistance of appellate counsel for failure to raise certain issues on direct appeal. D.I. 1 at 6, 8. In a letter to this Court dated May 15, 2006, Cardone raises the following additional claims: (3) ineffective assistance of counsel (unspecified); (4) judicial misconduct by the Superior Court judge and the Delaware Supreme Court Chief Justice; (5) malicious prosecution by the Attorney General's office; and (6) state and federal violations of his due process rights under the state and federal constitutions. D.I. 12.

A state petitioner seeking federal habeas relief must first exhaust remedies available in the state courts. 28 U.S.C. § 2254(b); *Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Rose v.*

*Lundy*, 455 U.S. 509, 515 (1982); *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Alston v. Redman*, 34 F.3d 1237, 1241-42 (3d Cir. 1994). In order to demonstrate that a claim has been exhausted in state court, a petitioner "must show that he presented each claim to the Delaware Supreme Court." *Bailey v. Snyder*, 855 F. Supp. 1392, 1399 (D. Del. 1993); *see also Picard*, 404 U.S. at 275; *Stevens v. Delaware Corr'l Center*, 295 F.3d 361, 369 (3d Cir. 2002); *Burkett v. Love*, 89 F.3d 135, 138 (3d Cir. 1996); *Toulson v. Beyer*, 987 F.2d 984, 986 (3d Cir. 1993). The habeas petitioner must afford each level of the state courts a fair opportunity to address the claims. *See Doctor v. Walters*, 96 F.3d 675, 678 (3d Cir. 1993). Further, Cardone must have presented to the state courts the legal and factual basis of the claims which he presents to the federal habeas court. *See* 28 U.S.C. § 2254(b); *Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Landano v. Rafferty*, 897 F.2d 661, 670-71 (3d Cir.), *cert. denied*, 498 U.S. 811 (1990); *Gibson v. Scheidemantel*, 805 F.2d 135, 139 (3d Cir. 1986).

Here, Cardone has not presented any of his claims to the state supreme court. The only claim presented on direct appeal by Cardone challenged the trial court's refusal to provide him a photocopy of his presentence report. *See Cardone*, 2006 WL 686588 at *1. Cardone complains now that he wanted to raise additional claims on direct appeal, but his counsel refused to present the claims that were suggested to him. D.I. 1 at 5. If Cardone is saying counsel's decision amounted to ineffective assistance, the proper procedural vehicle for raising ineffective assistance of counsel claims is a postconviction action under Superior Court Criminal Rule 61. *See Webster v. Kearney*, 2006 WL 572711, *4 (D. Del.); *Lecates v.Carroll*, 2003 WL 22937779, *4 (D. Del.). *See, e.g., Flamer v. State*, 585 A.2d 736, 753 (Del. 1990). The time for filing a

4

postconviction motion has not yet expired. Del. Super. Ct. Crim. R. 61(i)(1).[4] In addition, as explained, for example, by this Court in *Lecates v. Carroll*, 2003 WL 22937779, \*4 (D. Del.), none of the other procedural bars in Criminal Rule 61(i) would apply to a claim of ineffective assistance raised by Cardone. A fair reading of Criminal Rule 61 thus indicates that Cardone can present his allegations of ineffective assistance to the state courts, and in the absence of a state court decision clearly foreclosing his return to the state courts, Cardone has an available state remedy. *See Toulson v. Beyer*, 987 F.2d 984, 987-89 (3d Cir. 1993). Because Cardone has an available state remedy, resort to which is not clearly foreclosed, by which to present his claims of ineffective assistance, the claims are unexhausted. In turn, because Cardone's claims of ineffective assistance are not exhausted, the petition must be dismissed in its entirety unless Cardone voluntarily dismisses the unexhausted claims.[5] *E.g., Rose*, 455 U.S. at 520-21; *McMahon v. Fulcomer*, 821 F.2d 934, 940 (3d Cir. 1987).

Cardone also asserts claims of judicial misconduct, malicious prosecution and violations of his due process rights. D.I. 12. These claims have not been presented to the state supreme court. A state prisoner seeking federal habeas relief must exhaust remedies available in the state courts. 28 U.S.C. § 2254(b); *Castille*, 489 U.S. at 351; *Rose*, 455 U.S. at 515. Ordinarily, a failure to exhaust a claim results in dismissal of the habeas petition, *Rose v. Lundy, supra*, or a

---

[4] Under the rule, a prisoner has one year from the time that his conviction became final in which to file a state postconviction motion. (The rule was amended in July 2005 to reduce the filing period to one year.) Cardone's conviction became final, for purposes of the rule, on April 6, 2006 when the mandate issued by the state supreme court on Cardone's direct appeal. DEL. SUPER. CT. CRIM. R. 61(m)(2). Thus, Cardone has until April 2007 to move for state postconviction relief.

[5] Under *Rhines v. Weber*, if the petition contains exhausted and unexhausted claims, a district court can, under very limited circumstances, stay the federal habeas proceedings pending exhaustion of state remedies to avoid barring from federal court a petitioner who has otherwise timely filed his petition. *See* 544 U.S. 269, 277 (2005). That procedure is not available in Cardone's case because he has not established good cause for failing to satisfy the exhaustion requirement. *See id.*

stay of the federal habeas proceedings to allow the prisoner to exhaust state court remedies (*Rhines v. Weber*, 544 U.S. 269 (2005)). If, however, there is no available state remedy, Cardone is excused from the exhaustion requirement. *See Teague v. Lane*, 489 U.S. 288, 298 (1989); *Castille*, 489 U.S. at 351-52. Because Cardone did not raise his judicial misconduct, malicious prosecution and due process claims on direct appeal, the claims are procedurally defaulted under Superior Court Criminal Rule 61(i)(3). *See, e.g., McLaughlin v. Carroll*, 270 F. Supp. 2d 490, 512-13 (D. Del. 2003).

Thus, because there is no available state remedy, Cardone is excused from the exhaustion requirement. *See Teague*, 489 U.S. at 297-98; *Castille*, 489 U.S. at 351-52; *Clark v. Pennsylvania*, 892 F.2d 1142, 1146-47 (3d Cir. 1989); *Lawrie v.Snyder*, 9 F. Supp. 2d 428, 454 (D. Del. 1998); *Dawson v. Snyder*, 988 F. Supp. 783, 804 (D. Del. 1997). However, because Cardone procedurally defaulted these three claims in the state courts, federal habeas review is barred unless he establishes cause for the procedural default and actual prejudice. *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991); *Caswell v. Ryan*, 953 F.2d 853, 861-62 (3d Cir. 1992); *McLaughlin*, 270 F. Supp. 2d at 513. To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense" precluded his compliance with state procedural rules. *McClesky v. Zant*, 499 U.S. 467, 493 (1991); *Murray v. Carrier*, 477 U.S. 478, 487 (1986). Here, Cardone asserts ineffective assistance of appellate counsel in his petition, which can establish cause for a procedural default. *E.g., Werts v. Vaughn*, 228 F.3d 178, 193 (3d Cir. 2000); *Lines v. Larkin*, 208 F.3d 153, 166-67 & n.20 (3d Cir. 2000). As noted above, however, Cardone has failed to exhaust his ineffective assistance of counsel claims. *See Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000) (an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted);

6

*Carrier*, 477 U.S. at 488-89 (an allegation of constitutionally ineffective assistance of counsel as cause for a procedural default in a state court must itself be independently exhausted). Cardone has offered no explanation for his failure to present his ineffective assistance of counsel as cause for his default in the state courts, and thus this Court need not reach the question of whether he has shown any prejudice. *See Coleman*, 501 U.S. at 757; *Smith v. Murray*, 477 U.S. 527, 533 (1986); *McLaughlin*, 270 F. Supp. 2d at 513. Thus, consideration of Cardone's claims of judicial misconduct, malicious prosecution and due process violations are precluded because he procedurally defaulted the claims in state court.

In light of the foregoing, this Court should dismiss the petition without prejudice to provide Cardone the opportunity to present the unexhausted claims to the state courts. *See Rhines*, 544 U.S. at 273-74; *Rose*, 455 U.S. at 510, 522; *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997); *Webster*, 2006 WL 572711 at *2-3. Although the Court has discretion to stay the habeas proceedings to allow for exhaustion, the stay and abey procedure is appropriate only in cases where, *inter alia*, the petitioner has established good cause for failing to satisfy the exhaustion requirement. *See Rhines*, 544 U.S. at 277. Cardone has failed to offer any explanation for his failure to exhaust his state remedies, and thus the petition must simply be dismissed.

## Conclusion

Based upon the Superior Court docket sheets, it appears that transcripts of Cardone's preliminary hearing (February 21, 2002) (0201021864), sentencing hearing (May 12, 2005) (0201021864 & 0409005091A), trial (March 28, 2005) (0409005091A), and violation of probation hearing (July 29, 2005) (0201021864), and sentencing (July 29, 2005) (0201021864 & 0409005091A) have been prepared. In the event that the Court directs the production of any

7

transcript, respondents cannot state with specificity when such transcript would be available. However, respondents reasonably anticipate that such production would take 90 days from the issuance of any such order by the Court.

For the foregoing reasons, the petition for a writ of habeas corpus should be dismissed without prejudice.

/s/ Elizabeth R. McFarlan
Deputy Attorney General
Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8500
Del. Bar. ID No. 3759
elizabeth.mcfarlan@state.de.us

Date:  June 29, 2006

*This trial transcript has been served upon respondent's attorney, Elizabeth R. McFarlan, in support of Petitioner's §2254, and placed in DCC's mail system on July 16, 2006... cfc 7-16-2006*

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR SUSSEX COUNTY

- - - - - - - - - - - - - - - - - - - - - -

STATE OF DELAWARE       :  Criminal Action Nos.

                         :  04-09-0291, 04-09-0292,
                         :  04-09-0296, 04-09-0741,
    V.

                         :  ID# 0409005091A

CHARLES F. CARDONE,     :  *Please send a copy of this*

    Defendant.         :  *manuscript back to me at DCC.*

                                         *cfc*
                                  *December 12, 2005*

- - - - - - - - - - - - - - - - - - - - - -

T R A N S C R I P T
O F
P R O C E E D I N G S

Sussex County Courthouse
Georgetown, Delaware
Monday, March 28, 2005

BEFORE:

        THE HONORABLE T. HENLEY GRAVES, Judge,

        and a jury.

APPEARANCES:

        PAULA T. RYAN, Deputy Attorney General,

           appearing on behalf of the State.

        MICHAEL R. ABRAM, Esquire,

           appearing on behalf of the Defendant.

            * * * * *

DAVID WASHINGTON
Official Court Reporter

1                    INDEX TO TESTIMONY

2    STATE'S WITNESSES        DIRECT   CROSS   REDIRECT   RECROSS

3    Tara Boyer                28      33        -          -
     Shannon Judson            34      38        40         -
4    Gladys Taylor             41      48        -          -
     Joseph Klements           52      -         -          -
5    Letez Hudson              56      74        80         84
     Tyler Whitman             81      82        -          -
6    Wayne Abbott              85      91        -          -
     Paul Parsons              91      99        -          -
7    Tyler Whitman            101     105        -          -

8

9                    INDEX TO EXHIBITS

10   STATE'S MARKED FOR IDENTIFICATION                    PAGE

11   A                 DVD                                53
     B                 Pocketknife                        59
12


13

     STATE'S RECEIVED IN EVIDENCE                         PAGE
14
     1                 DVD                                55
15   2                 911 CD                             70
     3                 Pocketknife                        97
16

17

18

19

20

21

22

23


                    DAVID WASHINGTON
                  Official Court Reporter

```
1                         PROCEEDINGS

2                     - - - - - - - -

3          THE COURT:  Good morning.

4          Let's proceed.

5          THE CLERK:  We are about to select a jury in

6    the case of the State of Delaware against Charles F.

7    Cardone.  This a criminal case and the charges against

8    the defendant are:  Possession of a deadly weapon

9    during the commission of a felony, aggravated

10   menacing, disorderly conduct, resisting arrest,

11   criminal trespass in the third degree.

12          It is alleged the offenses occurred in Sussex

13   County, on or about September 7, 2004.  This trial

14   will begin today and we estimate it will take two

15   days.

16          Do you know anything about this case through

17   personal knowledge, discussion with anyone, the news

18   media or any other source?

19          Do you know the defendant or his friends or

20   relatives?

21          The State is represented by Paula T. Ryan, a

22   Deputy Attorney General.  The defendant is represented

23   by Michael Abram of the law firm of Edward C. Gill.
```

1          Do you know the attorneys in this case or any

2     other attorney or employee in the Offices of the

3     Attorney General or defense counsel?

4          Do you know any of the following persons who

5     might be called to testify as witnesses:  Officer

6     Tyler Whitman, Rehoboth Beach Police Department;

7     Sergeant Paul Parsons, Rehoboth Beach Police

8     Department; Officer Shannon Judson, Rehoboth Beach

9     Police Department; Letez Hudson, Rehoboth Beach,

10    Delaware; Wayne Abbott, Milton, Delaware; Tara Boyer,

11    Lewes, Delaware; Joseph Klements, Rehoboth Beach,

12    Delaware; Delphia Taylor, Ellendale, Delaware?

13         Do you have any bias or prejudice either for

14    or against the State or the defendant?

15         Do you have any religious reasons or reasons

16    of conscious that would prevent you from serving as a

17    juror on this case?

18         Is there any reason why you cannot give this

19    case your undivided attention and rendered a fair and

20    impartial verdict?

21         Do you have any physical or mental disability

22    that would affect your ability to render satisfactory

23    jury service?

DAVID WASHINGTON
Official Court Reporter

1          Are you being prosecuted for any criminal

2   offense anywhere?

3          Once again, this trial will begin today and

4   will last approximately two days.

5          If your answer to any of the above questions

6   is yes or you cannot serve through tomorrow, Tuesday,

7   March 29th, please come forward.

8          (Whereupon, counsel approached the bench and

9      the following proceedings were had:)

10          THE BAILIFF:  Helen Fletcher, Your Honor.

11          (Whereupon, the prospective juror approached

12      the bench.)

13          THE COURT:  Yes, ma'am.

14          PROSPECTIVE JUROR:  I have a doctor's excuse

15   for my back, not being able to sit too long.  I'd like

16   to try.

17          THE COURT:  We take breaks for the court

18   reporters and for staff and for everyone every

19   hour-and-a-half or so.

20          PROSPECTIVE JUROR:  I would like to stay.

21          THE COURT:  Okay.  Thank you.

22          (Whereupon, the prospective juror left the

23      bench and another prospective juror approached

DAVID WASHINGTON
Official Court Reporter

```
 1          the bench.)

 2               THE BAILIFF:  Troy Maull, Your Honor.

 3               THE COURT:  Good morning, sir.

 4               PROSPECTIVE JUROR:  I remember he was caught.

 5     I have a doctor's appointment every three months.  I

 6     will --

 7               THE COURT:  I will excuse you.

 8               (Whereupon, the prospective juror left the

 9          bench and another prospective juror approached

10          the bench.)

11               THE BAILIFF:  Dolena Bowden.

12               THE COURT:  Good morning, ma'am.

13               PROSPECTIVE JUROR:  The religious or

14     something?

15               THE COURT:  If your religion -- if any

16     personal believes get in the way of being a juror and

17     making a fair and impartial decision, regardless of

18     what the consequences are, then I need to know that.

19     Will your religion get in the way?

20               PROSPECTIVE JUROR:  Yes.

21               THE COURT:  I will excuse you.

22               PROSPECTIVE JUROR:  Do I have to call in?

23               THE COURT:  No, you are excused for two
```

```
 1    weeks.  You are done.

 2              PROSPECTIVE JUROR:  Thank you.

 3              (Whereupon, the prospective juror left the

 4         bench and another prospective juror approached

 5         the bench.)

 6              THE BAILIFF:  Gregory Oliver.

 7              THE COURT:  Yes, sir.

 8              PROSPECTIVE JUROR:  Good morning, Your Honor.

 9    If I heard right, you want to know if I know somebody

10    in the Attorney General's Office?

11              THE COURT:  Yes.

12              PROSPECTIVE JUROR:  A friend and coworker is

13    Frederick Shank with the Attorney General in the

14    Department of Transportation.

15              THE COURT:  Would knowing him and being

16    friends with him and working with him in any way

17    interfere with your ability to be fair and impartial

18    in this case?

19              PROSPECTIVE JUROR:  No.

20              THE COURT:  Would you favor the State's case

21    because of knowing him?

22              PROSPECTIVE JUROR:  No, Your Honor.

23              THE COURT:  Would you disfavor the State's
```

 1    case because of knowing him?

 2              PROSPECTIVE JUROR:  No, Your Honor.

 3              THE COURT:  I will keep you on.  Thank you.

 4              (Whereupon, the prospective juror left the

 5         bench and another prospective juror approached

 6         the bench.)

 7              THE BAILIFF:  William Bradley, Your Honor.

 8              THE COURT:  Yes, sir.

 9              PROSPECTIVE JUROR:  Sir, the medical

10    problems, I got a lot of testing and --

11              THE COURT:  I will excuse you for the rest of

12    the two weeks.  You take care of yourself.

13              PROSPECTIVE JUROR:  All right.  Thank you.

14              (Whereupon, the prospective juror left the

15         bench and another prospective juror approached

16         the bench.)

17              THE BAILIFF:  Cheryl Walls, Your Honor.

18              THE COURT:  Hello.

19              PROSPECTIVE JUROR:  I know Paula.

20              THE COURT:  I will go ahead and excuse you

21    from this case and have you use the call-in number,

22    but I believe this is the only one, this case, but use

23    it.


                        DAVID WASHINGTON
                     Official Court Reporter

```
1                    PROSPECTIVE JUROR:  Thank you.

2                    (Whereupon, the prospective juror left the

3           bench and another prospective juror approached

4           the bench.)

5                    THE BAILIFF:  Amy Watson, Your Honor.

6                    PROSPECTIVE JUROR:  I am on probation.

7                    THE COURT:  I will excuse you from this case.

8     Thank you.

9                    (Whereupon, the prospective juror left the

10          bench and another prospective juror approached

11          the bench.)

12                   THE BAILIFF:  Catherine Taylor.

13                   THE COURT:  Good morning.

14                   PROSPECTIVE JUROR:  I work with probation and

15    parole and I believe Mr. Cardone was on probation.  He

16    has a violation pending.

17                   THE COURT:  I will excuse you from this case.

18                   (Whereupon, the prospective juror left the

19          bench and another prospective juror approached

20          the bench.)

21                   THE BAILIFF:  Joseph Myers, Your Honor.

22                   THE COURT:  Yes, sir.

23                   PROSPECTIVE JUROR:  I thought I should let
```

10

1    you know, I go to the bathroom quite frequently.

2            THE COURT:  Me too.  I can't pass the

3    bathroom without the opportunity.  If our breaks

4    aren't frequent enough, put your hand up if you are on

5    the jury.

6            PROSPECTIVE JUROR:  That's what I came up

7    for.

8            THE COURT:  Not a problem.

9            (Whereupon, the prospective juror left the

10       bench.)

11           THE COURT:  Exceptions, if any?

12           MS. RYAN:  No exceptions.  I notice someone

13   on the list is Letonoff.  There is a Letonoff officer

14   that works at the Rehoboth Beach Police Department.  I

15   don't know if they are related somehow.

16           THE COURT:  If she's called, we will bring

17   her up.  If she gets on the panel, remind me and we

18   will bring her up and see if she knows anything about

19   the people.

20           MS. RYAN:  It is a Rehoboth case.

21           MR. ABRAM:  No exceptions.

22           THE COURT:  Okay.

23           (Whereupon, counsel returned to the trial

DAVID WASHINGTON
Official Court Reporter

```
 1          table and the following proceedings were had:)

 2               THE CLERK:  When your names are called,

 3    please come forward and have a seat in the jury box:

 4               Sandra Banks.

 5               Betty Taylor.

 6               Joyce Figgs.

 7               Joseph Maisano.

 8               Verna Bertrand.

 9               Sarah Alexander.

10               Curtis Davidson.

11               Gregory Oliver.

12               Mable Gaines.

13               Grace Lowe.

14               THE BAILIFF:  Sir, she would like to speak to

15    you.

16               THE COURT:  Sidebar.

17               (Whereupon, counsel approached the bench and

18        the following proceedings were had:)

19               THE BAILIFF:  Grace Lowe.

20               (Whereupon, the prospective juror approached

21        the bench.)

22               THE COURT:  Yes, ma'am?

23               PROSPECTIVE JUROR:  I was just waiting it
```

12

```
 1    out.  When I read about it in the paper, I assumed he

 2    was the husband of Joyce Cardone.  If he is, I know

 3    him.  If he's not, he's okay. ? what the hell does this mean ?

 4         THE COURT:  I will go ahead and excuse you

 5    because it was in the paper.  I don't think there is a

 6    whole lot -- it is an unusual name.  I will be

 7    cautious and excuse you.

 8         MS. RYAN:  For the record, I think he's

 9    divorced.

10         THE COURT:  Cardone is a different kind of

11    name.  She said she read about something.  She lives

12    in Lewes, so she's on that side of Sussex County.

13         (Whereupon, counsel returned to the trial

14       table and the following proceedings were had:)

15         THE CLERK:  Ruth Smallwood.

16         Susan Bennett.

17         Dora Smith:

18         Gregory Oliver, please step out of the jury

19    box.

20         THE COURT:  Any one excused, remain with the

21    panel and you will be excused at the end of the

22    selection process.

23         THE CLERK:  Van Warrington.
```

DAVID WASHINGTON
Official Court Reporter

1          Joseph Maisano, please step out of the jury

2     box.

3          Don Liller.

4          Verna Bertrand, please step out of the jury

5     box.

6          James Lindermeier.

7          Susan Bennett, please step out of the jury

8     box.

9          Judy Griffith.

10          Don Liller, please step out of the jury box.

11          John Zelewski.

12          MS. RYAN:  The State is content.

13          MR. ABRAM:  The defense is content.

14          THE COURT:  Two alternates, one strike.

15          THE CLERK:  Kimberly Messick.

16          Helen Fletcher.

17          MR. ABRAM:  May we approach, Your Honor?

18          THE COURT:  Yes.

19          (Whereupon, counsel approached the bench and

20      the following proceedings were had:)

21          MR. ABRAM:  Ms. Messick is a correctional

22     officer at SCI.  Mr. Cardone has quite a reputation.

23     I am sure she knows something about him.  I'd like her

```
1    excused for cause.

2              THE COURT:  Ms. Messick?

3              MR. ABRAM:  Yes.

4              THE COURT:  Mrs. Messick, can you come to the

5    sidebar.

6              PROSPECTIVE JUROR:  Yes, sir.

7              (Whereupon, the prospective juror approached

8         the bench.)

9              THE COURT:  You are a correctional officer?

10             PROSPECTIVE JUROR:  Yes, sir.

11             THE COURT:  I will go ahead and excuse you.

12   Even if you don't know him, you may come into contact

13   with him.

14             PROSPECTIVE JUROR:  Okay.  I figured, sir.

15   Thank you.

16             (Whereupon, the prospective juror left the

17        bench.)

18             Karen, replace her for cause.

19             MR. ABRAM:  Thank you, Your Honor.

20             MS. RYAN:  Thank you.

21             (Whereupon, counsel returned to the trial

22        table and the following proceedings were had:)

23             THE CLERK:  Lee Whaley.
```

1            MR. ABRAM:  The defense is content.

2            MS. RYAN:  The State is content.

3            THE COURT:  All right.  The remaining panel,

4    I thank you very much.  We are staying in session.  So

5    please, when you excuse yourselves, do so quietly.

6    Please don't talk.  You are excused.  Use the call-in

7    number that was given to you.  Court is in session.

8    Thank you.

9            Please swear the jury.

10           (Whereupon, after being examined on their

11       voir dire, a jury panel of twelve and two

12       alternates was duly impaneled and sworn.)

13           THE COURT:  I am going to orient you, a

14    little further orientation.

15           JUROR No. 4:  I had an issue.

16           THE COURT:  Excuse me.  Come to the sidebar.

17           (Whereupon, counsel approached the bench and

18       the following proceedings were had:)

19           (Whereupon, Juror No. 4 approached the

20       bench.)

21           JUROR No. 4:  I didn't mean to disrespect

22    you.  I didn't understand what the lady when she was

23    calling out the names was saying about if you cannot

16

1    be here.  I didn't know I was going to get picked for

2    the jury and financially, I can't stay here another

3    day.  I didn't mean to mess up anybody's process.

4         THE COURT:  She was very clear.  We give

5    clear instructions.

6         JUROR No. 4:  That's what I'm saying:  I

7    didn't understand what was said and no one ever

8    addressed it.  Then I was called up here.  I didn't

9    know what to do at that point.

10        THE COURT:  We did address it, sir.  The

11   clerk said if there is any reason why you cannot serve

12   for two days, actually she said that twice, you didn't

13   come up.

14        JUROR No. 4:  Your Honor, I couldn't hear in

15   the back of the thing.

16        THE COURT:  I will excuse you, sir.

17        JUROR No. 4:  Thank you.

18        (Whereupon, the Juror No. 4 was excused and

19      left the courtroom.)

20        THE COURT:  Exceptions?

21        MS. RYAN:  No.

22        MR. ABRAM:  No.

23        THE COURT:  There was no point keeping

DAVID WASHINGTON
Official Court Reporter

*It is given as a matter of discretion at jury trials in Delaware. In Claudio, the Delaware Pattern Jury instructions were given after attorneys' openings, why was mine done before?* 17)

1    someone that didn't want to be on there.

2          (Whereupon, counsel returned to the trial

3    table and the following proceedings were had:)

4          THE COURT:  Alternate No. 1 is now Juror No.

5    4.          INTRODUCTORY INSTRUCTION - *Delaware Pattern Jury Instruction 1C.*

6          Ladies and gentlemen, I am going to give you

7    some brief comments and then move over to Courtroom

8    No. 2.  Hopefully the temperature will be cooler and

9    comfortable.

10          Mr. Cardone is charged with certain crimes by

11    the State.  He is charged by the State filing certain

12    paperwork with this Court, what is called an

13    indictment or information.  Its purpose is basically

14    severalfold, but what it does is it makes us aware of

15    the charges.

16          It has no evidentiary value.  The fact that *Bias &*

17    the State has filed it is no evidence concerning the *prejudicial*

18    allegations the State makes.  The purpose of the *statements by Court*

19    indictment is to inform the defendant of the

20    accusations that the State is making and it informs

21    the Court it is making these accusations and, thereby,

22    when I give you the instructions at the end of the

23    case, I will refer to the indictment and to the

DAVID WASHINGTON
Official Court Reporter

1   elements of the specific crimes the State must prove

2   and their burden of proof.  It also allows us to place

3   the case on the trial docket.  So the fact that an

4   information or indictment has been filed has no

5   evidentiary value whatsoever.

6        The purpose today and tomorrow is basically

7   to put the State to its proof.  The State must

8   overcome the presumption of innocence that all persons

9   charged with a crime enjoy.  They must overcome that

10  presumption by prove beyond a reasonable doubt.  And

11  if the State cannot do that, then you must find the

12  defendant not guilty.  It's the State's burden.  The

13  defendant has no burden at all.  The defendant has no

14  burden to call witnesses or testify at all.  Again,

15  the defendant is presumed innocent until the State can

16  establish its burden of proof.

17        In a few moments, after we move to the other

18  courtroom, the lawyers will be given the opportunity

19  to give you what is called opening statements.  The

20  purpose of an opening statement is to allow the

21  lawyers to talk to you, to tell you who they are, what

22  their jobs are.  They could talk a little bit about

23  the case, a little bit about the law involved.

DAVID WASHINGTON
Official Court Reporter

19

1    Basically it's to kind of give you a review of what it

2    is going to be coming forward during the trial so it

3    may fit better logically for you so you understand.

4        At the end of the case, the lawyers get to

5    talk to you a second time.  It is called closing

6    arguments.  It is exactly what it sounds like.  They

7    will argue their respective positions of the case as

8    to what you heard and how it fits their theories of

9    the case.  The lawyers are professionals.  They will

10   not try to mislead you or play games with you, but as

11   I told you, you must reply upon your collective

12   recollections of the events.  The lawyers are not

13   witnesses.  They will tell you what they think will

14   happen or what they think the testimony has been, but

15   you rely on your recollections when you go back to

16   deliberate.

17       Each of them are duty bound by their

18   constitutional oath when they became attorneys to make

19   certain objections when the lawyer thinks an objection

20   is appropriate under our rules of evidence.  When a

21   lawyer makes an objection, he or she is not sitting

22   there saying:  Gee whiz, I'd like to keep that away

23   from the jurors.  They are not doing that at all.

*[handwritten margin note: He is misleading Jurors may ask for transcript of testimony to aid in recollection]*

1    They are basically asking me to follow the rules of

2    evidence and make certain decisions.  They are legal

3    questions which don't involve you all.  So the lawyers

4    know that I want them to come to the sidebar and argue

5    their positions.  I can make my rulings.  I have been

6    around long enough to know that even when I do this at

7    the sidebar, that you all usually can figure out what

8    my ruling is.  I don't mind that.  Whether I sustain

9    or overrule the objection -- sometimes you will hear I

10   will sustain the objection and strike it -- I do it at

11   the sidebar because it really helps me question and

12   helps me make my analysis, but you don't need to hear

13   all that because sometimes it is hard to unring the

14   bell if I say:  Well, I sustained the objection,

15   ladies and gentlemen, forget about what you just

16   heard.  Sometimes that is difficult.  I try to make

17   your job a little easier for you.  Please know by my

18   rulings, my body language, my demeanor, I am not

19   attempting to send you any message as to how you, the

20   jury, decide the case.  As I spoke to you earlier

21   today, twelve of you will ultimately decide the case.

22   You will finally be the judges of the case.  My job is

23   to be the neutral umpire.  *He lost his neutrality when he addressed the jury w/ his biased and prejudicial statements of me*

DAVID WASHINGTON
Official Court Reporter

1        Now, if anything occurs during the course of

2    the trial, if you recognize anybody, you overhear

3    anything, anything that could affect that important

4    impartiality that we talked about this morning, don't

5    discuss it with anyone, don't discuss it with your

6    fellow jurors.  If anything occurs in the courtroom,

7    put your hand up.  We will notice you and talk to you

8    at the sidebar.  If something occurs outside the

9    courtroom, let the bailiff know.  Do not talk about it

10   with your fellow jurors.  Let the bailiff know and we

11   will talk to you at the sidebar.

12        Finally, baseball season is upon us, so I am

13   more comfortable.  In the words of Yogi Berra:  It

14   ain't over til it's over; it ain't over til it's over.

15   You may catch yourself thinking that you figured out

16   what this is all about.  Stop and say:  It ain't over

17   til it's over.  I don't want you jumping to

18   conclusions.  I don't want you to try to solve the

19   mystery.  I want you to hear everybody out.  I want

20   you to hear the law and closing arguments.  Then at

21   that time, you begin your deliberations.  Once you

22   start jumping to conclusions, it's hard to move off

23   those positions.  Well, it may be human nature to want

DAVID WASHINGTON
Official Court Reporter

```
 1    to discuss the case with your fellow jurors during

 2    breaks or lunch or with other people, you are ordered

 3    you cannot discuss the case even with each other until

 4    the deliberations at the final end of the case.

 5           Now we will go ahead and stay in session as

 6    the jury is moved over to Courtroom 2 and we move over

 7    and follow you.

 8           (Whereupon, the jury left the courtroom.)

 9           THE COURT:  Okay.  As soon as corrections can

10    get him to 2, we should be able to get started.  They

11    will take him down and back up.

12           MS. RYAN:  I didn't know whether they were

13    putting the jurors in the seats or in the jury room.

14           THE COURT:  They will be in the jury room.

15           MS. RYAN:  There is just something I want to

16    bring up before we get started.

17           THE COURT:  Do it right now.

18           MS. RYAN:  That's fine.  Your Honor, the

19    allegations in this case involves an incident at the

20    Royal Farms in Rehoboth.  What preceded the incident

21    that Mr. Cardone was charged with is something that

22    occurred the evening before, but the event he is

23    charged with, to put them in context, I will be
```

*[handwritten margin note:]* Paula tells the judge she is going to use perjured testimony by the clerk at Royal Farms

*[handwritten note near line 17-18:]* this is where

DAVID WASHINGTON
Official Court Reporter

(23)

```
 1   presenting evidence of what occurred the evening

 2   before.

 3           THE COURT:   The issues are?   Tara Boyer

 4           MS. RYAN:  He went to the same Royal Farms

 5   the evening before and asked to use the bathroom and

 6   was told there wasn't a public bathroom he could use

 7   He went out and urinated in the parking lot of the    prosecutorial
                                                           misconduct
 8   Royal Farms.  The police were called.  He was issued a

 9   summons for that in Alderman's Court for public

10   urination.  The State anticipated having the clerk    she stated
                                                           she did not
11   that called 911 the evening before this happened, as  see me
                                                           urinate
12   well as the officers, the police officer that issued

13   Mr. Cardone the summons.  I don't believe this is a

14   404(b) issue.  Out of an abundance of caution, I

15   wanted to bring it to the Court's attention.  What

16   transpires the next evening, Mr. Cardone returns to

17   the Royal Farms despite being told not to return - no

18   that's the subject of the criminal trespass -- and    reduced
                                                           to 3rd
                                                           degree
19   confronts another clerk and allegedly displays a knife

20   to him and confronts him saying:  I was here the night

21   before, I asked to use the bathroom, it was you, it   no

22   was you.  The State believes to put that in context, I

23   need to present the events of the previous evening,
```

I did not
say that, she is lying
to 6 races to put
me in a bad light

                    DAVID WASHINGTON
                    Official Court Reporter

She is making
statements to 6 races
that puts him in a
bias + prejudicial position
against me

24

*why wasn't it in the indictment?*

*Getz*

1   although that urination charge is not before the

2   Court.

3             THE COURT:  Mr. Abram?

4             MR. ABRAM:  It doesn't appear in the police

5   report from the night in question.  There doesn't

6   appear to be any follow-up.  The State hasn't informed

7   me what happened with this charge.  They are

8   attempting to prove the criminal trespass by him being

9   told to stay away on that night after his arrest.

10  That night, there is no paperwork, no follow-up to

11  Alderman's Court, nothing.  I find myself -- it is

12  Getz.  I am trying to defend an incident that took

13  place when there is no police follow-up whatsoever or

14  stated actions whatever.

15            THE COURT:  I don't understand what the

*He overruled Abram's objection.*

16  objection is to Getz.  I will allow it.  It's relevant

17  to motive and intent.  It's almost inextricably

18  intertwined with the act the second day.  It is in the

19  vacuum.  You leave the jury scratching their head.  It

20  goes to motive and intent.  There are witnesses here

*these witnesses say one thing on*

21  to testify as to that based upon the proffer as to two

*OFFER*

22  witnesses.  It is close in time.  In doing the

*warrant or impeached on the stand*

23  prejudice versus the probative value, this is not the

DAVID WASHINGTON
Official Court Reporter

25

1    first incident. It is not the type of crime that will

2    get the jury all worked up and create a lot of

3    prejudice. It is minimal prejudice. The only thing I

4    need to find out, you to tell me, I will give them a

5    Getz instruction, that you should not use the prior

6    incident to determine Mr. Cardone is a bad person and

7    use that as a conviction. It may be one of those

8    situations from a trial strategy point of view that

9    the defense may not want that type of instruction

10   because it makes it appear worse than what it is. So

11   you can tell me if you want the instruction, okay? *He never gave Getz instruction*

12        MR. ABRAM: Okay. Thank you, Your Honor.

13        THE COURT: We will move to the other

14   courtroom.

15        (Whereupon, Court stood in recess. Following

16        which, Court reconvened and the following

17        proceedings were had:)

18        THE COURT: Good morning.

19        Let's bring the jury in.

20        THE BAILIFF: Yes, sir, Your Honor.

21        (Whereupon, the jury returned to the

22        courtroom.)

23        THE COURT: Openings.

DAVID WASHINGTON
Official Court Reporter

26

1          MS. RYAN:  Good morning, ladies and

2     gentlemen.  My name is Paula Ryan.  Seated to counsel

3     table is Officer Whitman of the Rehoboth Police

4     Department.  What you will hear about today is a

5     couple of incidents that occurred at the Royal Farms

6     convenience store in Rehoboth, Delaware on the 6th and

7     7th of September, 2004.  The story starts on the 6th

8     of September, 2004, when the defendant, Charles

9     Cardone, came into the convenience store and asked to

10    use the bathroom.  The Royal Farms did not have a

11    public bathroom.  Mr. Cardone was told that.

12    Mr. Cardone was not happy with this and went out into

13    the parking lot and urinated in the parking lot.  The

14    police were called September 6th for this incident.

15    He was contacted by the police and issued a summons.

16          The following evening, despite being told not

17    to return to the Royal Farms, Mr. Cardone, the

18    defendant, returned to the Royal Farms.  The evidence

19    will show that Mr. Cardone confronted the clerk that

20    was in there the previous evening and confronted him,

21    displayed a knife to him and he demanded to know

22    whether he was the one that called the police the

23    night before.  You will hear from that clerk that

1    occurred on September 7th, that he was confronted with

2    the knife.  You will hear there was another individual

3    that was present.  He walked in the convenience store

4    when this knife was displayed.  You will hear from the

5    officers that were called on September 7th that

6    responded and located Mr. Cardone across the circle at

7    another convenience store, the 7-Eleven and located a

8    knife in his possession.  He resisted arrest, you will

9    hear, and he caused something of a scene at the

10    7-Eleven.  You will hear from the clerk in the

11    7-Eleven that will describe what they viewed when Mr.

12    Cardone was placed in the car by the officers.

13           THE COURT:  Mr. Abram, opening.

14           MR. ABRAM:  Thank you, Your Honor.

15           Still morning.  Good morning, ladies and

16    gentlemen.  I am Michael Abram.  Seated at the table

17    with me is Mr. Cardone.  He is the defendant in this

18    case today.  You have heard what the State has alleged

19    happened on these two days in question.  You will hear

20    that some incidents occurred at the Royal Farms.  The

21    one thing the State did not inform you about was the

22    size of the knife.  You will get to see the knife

23    yourselves and you will be able to make the

*The [illegible] it was not a deadly weapon because the blade was not opened.*

28

```
 1   determination as jurors if legally this was a deadly
 2   weapon.  You will see it's about the size, when
 3   extended, of a toothpick, a very large toothpick, but
 4   a toothpick.  You will also hear that upon his coming
 5   in contact with the police at the 7-Eleven that Mr.
 6   Cardone was wearing headphones.  Mr. Cardone,
 7   according to the police, did not appear to understand
 8   exactly what was going on before his alleged resisting
 9   arrest occurred.  You will hear all those things as
10   well.
11              I will point out to you, obviously the Judge
12   will certainly point out to you later, that the burden
13   of proof is on the State.  You will not see much
14   coming from the defense because it's not our burden to
15   prove Mr. Cardone not guilty.  It's the State's burden
16   beyond a reasonable doubt to prove him guilty.  I ask
17   you take everything and listen carefully and come to
18   your own independent determination as to whether or
19   not the State has met their burden.  Thank you.
20              THE COURT:  Call your first witness.
21              MS. RYAN:  The State calls Tara Boyer.
22                        TARA BOYER
23   was called as a witness by and on behalf of the State
```

DAVID WASHINGTON
Official Court Reporter

BOYER - DIRECT

1    of Delaware and, having been first duly sworn, was

2    examined and testified as follows:

3                    DIRECT EXAMINATION

4    BY MS. RYAN:

5         Q.    Ms. Boyer, where do you work?

6         A.    Royal Farms.

7         Q.    Were you working at the Royal Farms in

8    September of 2004?

9         A.    Yes, ma'am.

10        Q.    Specifically on September 6th of 2004, were

11   you working with Royal Farms?

12        A.    Yes, ma'am.

13        Q.    Which location?

14        A.    Rehoboth.

15        Q.    On September 6th, when you were working at

16   Royal Farms, do you recall an unusual incident

17   occurring?

18        A.    Yes, ma'am.

19        Q.    What do you recall occurring on

20   September 6th, 2004?

21        A.    I had another employee at the CSL.  She

22   called me outside, she asked me to come outside.  I

23   came out by the phone booth.  Her and a gentleman was

*[handwritten annotation: who is she? why isn't she there?]*

DAVID WASHINGTON
Official Court Reporter

30

BOYER - DIRECT

1    standing there.  The gentleman asked her could he use

2    the bathroom.  She told him:  We are not allowed to

3    let anyone use the bathroom because it's not a public

4    bathroom.  He said to her, that if she didn't let him

5    use --

6    ——————— MR. ABRAM:  Objection, Your Honor.

7              THE COURT:  Sidebar.

8              THE WITNESS:  -- the bathroom --

9              THE COURT:  Excuse me, ma'am.

10             (Whereupon, counsel approached the bench and

11        the following proceedings were had:)

12             MR. ABRAM:  She's recalling a prior

13    conversation.  The whole thing is hearsay. *where is*

14             THE COURT:  Your objection is whether or not

15    she was stating what allegedly your client said?

16    That's not hearsay.                 *who is she? Where is she?*

17             MR. ABRAM:  The other woman  She's not even

18    part of this conversation. *this other woman was not in discovery*
                                 *and she was not available to be cross examined*

19             THE COURT:  I understand.  You didn't object

20    to that part.

21             MR. ABRAM:  That's what -- if I have to stand

22    back up, then I will.

23             MS. RYAN:  I believe this witness heard this.

DAVID WASHINGTON
Official Court Reporter

31

BOYER - DIRECT

1          THE COURT:  She can testify as to what she

2    heard the defendant say.

3          MS. RYAN:  The defendant say.

4          MR. ABRAM:  That's not the person I have the

5    problem with.  It's the other person.  *Appealable because of prejudicial*

6          THE COURT:  I'm not striking that.  I don't

7    believe it's that great a thing.  There was no

8    objection at the time.  You need to stand up and make

9    the objection when it is coming out, not later.

10         MR. ABRAM:  I understand.

11         (Whereupon, counsel returned to the trial

12         table and the following proceedings were had:)

13         THE COURT:  Those same people I talked about

14   in orientation, that was the white noise we put on at

15   the sidebar to block out.  The only unfortunate aspect

16   about the white noise is it goes right in the base of

17   my spine and gives me a headaches when it is on more

18   that 30 seconds.  I apologize, but that's why it is

19   on.          *what is he talking about?*

20   BY MS. RYAN:

21         Q.  Ms. Boyer, focussing on what occurred when

22   you came outside the store, the gentleman you referred

23   to, did he say anything in your presence?

DAVID WASHINGTON
Official Court Reporter

BOYER - DIRECT

32

1    A.    Yes.  He said that if we didn't let him use

2    the bathroom, he was going to pee outside publicly.

3    So I came back inside and I called 911 and Aaron was

4    still outside.

5    Q.    Aaron, the other employee?

6    A.    Yes, Aaron was the other employee there.

7    Q.    Without getting into what she said, you

8    stated you went back inside and called the police?

9    A.    Yes, ma'am.

10    Q.    Did the police respond?

11    A.    Yes, they did.  After that, I went back

12    outside and he rode off on a bike.  I did notice the

13    urine.  He didn't urinate in front of the Royal Farms.

14    He urinated in front of the laundromat.  I came back

15    in and called the police.  The police came.  He asked

16    me questions.  I gave them a description of the

17    person.  They went on and they left and called us back

18    on the telephone and told us that they had apprehended

19    the person.

20    Q.    When you came back out, you indicated you saw

21    the location of where Mr. Cardone urinated?

22    A.    Yes, ma'am.

23    Q.    Had that been out there when you came outside

DAVID WASHINGTON
Official Court Reporter

33

1     the first time?

2         A.    No, ma'am, because we have to clean the

3     parking lot.  It was not there.

4         Q.    The individual that was out with the other

5     employee when you came out and saw that man, do you

6     see him in the courtroom?

7         A.    Yes, ma'am.

8         Q.    Where is he?

9         A.    He's sitting over there, right there with the

10    black vest on and white shirt.

11            MS. RYAN:  I have nothing further.

12            THE COURT:  Mr. Abram, questions, if any?

13            MR. ABRAM:  Thank you, Your Honor.

14                      CROSS-EXAMINATION

15    BY MR. ABRAM:

16        Q.    You said you have to clean the parking lot?

17        A.    Yes, we do.

18        Q.    How often do you have to clean the parking

19    lot?

20        A.    We do it every shift.  Every shift.  We have

21    to clean the parking lot periodically because we get

22    frequent people, shoppers.  They check to see if the

23    parking lot is clean.  *They do not clean the laundrymat parking lot area...*

                      DAVID WASHINGTON
                  Official Court Reporter

34

BOYER - CROSS

1    Q.    How far beforehand had the parking lot been

2    cleaned?

3    A.    I don't know because I came on later on that

4    day.

5    Q.    And just to clarify:  You didn't see Mr.

6    Cardone actually peeing, did you?

7    A.    No, I didn't.

8    Q.    And it could have been any liquid on the

9    ground, couldn't it?

10    A.    There was no liquid on the ground until after

11    that happened. *After what happened?*

12    Q.    Okay.

13        MR. ABRAM:  No further questions, Your Honor.

14        MS. RYAN:  I have nothing further.

15        THE COURT:  The witness is excused.  Thank

16    you, ma'am.

17                        (Witness steps down.)

18        THE COURT:  Call your next witness.

19        MS. RYAN:  Patrolman Judson.

20                SHANNON JUDSON

21    was called as a witness by and on behalf of the State

22    of Delaware and, having been first duly sworn, was

23    examined and testified as follows:

JUDSON - DIRECT

1                    DIRECT EXAMINATION

2    BY MS. RYAN:

3        Q.    Patrolman Judson, where do you work?

4        A.    Rehoboth Beach Police Department.

5        Q.    Were you working for the Rehoboth Beach

6    Police Department in September of 2004?

7        A.    Yes, I was.

8        Q.    On September 6th, 2004, did you have occasion

9    to investigate an incident that occurred at the Royal

10   Farms in Rehoboth?

11       A.    Yes, I did.

12       Q.    What, if anything, did you do in response to

13   that?

14       A.    I received a call from the Royal Farms that

15   there was an individual that came into the store and

16   wanted to use the bathroom.  They informed him they

17   didn't have a public bathroom, at which time, he left

18   the establishment and urinated outside in the parking

19   lot. *No one saw me ... they lied to get me arrested ...*

20       Q.    Did you have a description of the individual

21   you were going to be investigating?

22       A.    I believe at the time I only had the

23   description of his clothing.

DAVID WASHINGTON
Official Court Reporter

36

JUDSON - DIRECT

1      Q.    Did you have a description of any mode of
2    transport?

3      A.    He was on a bicycle.

4      Q.    Did you attempt to look for this individual?

5      A.    Yes, I did.  The last call we got from the
6    Royal Farms they said he was on a bicycle and he was
7    heading westbound through the traffic circle towards
8    Route 1.

9      Q.    Were you able to locate an individual by this
10   description?

11     A.    Yes, I was.  I located him on Rehoboth Avenue
12   Extended at the Henlopen Junction at the small strip
13   mall.

14     Q.    Did he fit the description the individuals at
15   Royal Farms gave?

16     A.    Yes, he did.

17     Q.    What state and county is the Royal Farms
18   located in?

19     A.    It's in Delaware, Sussex County, State of
20   Delaware.

21     Q.    When you contacted this individual, did you
22   discuss with him what had reportedly occurred at Royal
23   Farms?

1    A.    Yes, I did.  When I contacted the individual,

2    I told him that we were informed by the management of

3    the Royal Farms that he had urinated in the parking

4    lot, at which time he told me that he wanted to use

5    the bathroom there and I guess they wouldn't let him,

6    so he went out in the parking lot and urinated. *I did not say that....*

7    explained to him that that's not really the thing to

8    do if you don't have a bathroom to use at the time and

9    also the management of the Royal Farms didn't want him

10   back there any more. *lies* —

11   Q.    You told him not to go back to the Royal

12   Farms?

13   A.    Yes *lie*

14   Q.    Did he?

15   A.    Yes, he did.

16   Q.    Are there public bathrooms in Rehoboth? *they are at least ½ mile away*

17   A.    Yes, there are.

18   Q.    When you contacted this individual, you

19   indicated he fit the description that the Royal Farms

20   people had given you?

21   A.    Yes.

22   Q.    And that you discussed this incident with

23   him?

DAVID WASHINGTON
Official Court Reporter

JUDSON - CROSS

1    A.    Yes.

2    Q.    Do you see that individual in the courtroom?

3    A.    Yes, I do.

4    Q.    Where is he?

5    A.    Seated at the table right here to my left.

6    Q.    What is he wearing?

7    A.    Wearing a white shirt with a black vest.

8    Q.    Did you take him into custody at that point?

9    A.    No, I did not.  At the time I issued the

10   subject a criminal summons to the Alderman's Court in

11   Rehoboth Beach and gave him a court date where he

12   needed to report and I cut him loose at that time.  *He did not tell me not to go back to store*

13        MS. RYAN:  I have nothing further.

14        THE COURT:  Mr. Abram.

15              CROSS-EXAMINATION

16   BY MR. ABRAM:        *Ineffective Cross examination*

17   Q.    Officer, you indicated there are public

18   bathrooms in Rehoboth Beach?

19   A.    Yes, there are.

20   Q.    Can you tell me approximately how far away

21   they are from the Royal Farms?

22   A.    I believe there is the public bathrooms that

23   are just west of the Royal Farms in the park there.

DAVID WASHINGTON
Official Court Reporter

*Bathrooms are closed & locked that time of day and time of year.*

JUDSON - CROSS

1    It's adjacent to the traffic circle.  It is almost

2    right next door to the Royal Farms.  There is a park

3    and there are restrooms there.

4        Q.    Are you sure?

5        A.    Fairly certain.

6        Q.    Do they have hours on those bathrooms?

7        A.    I am unaware of that.

8        Q.    You said you asked -- told Mr. Cardone not to

9    go back to the Royal Farms? *We cannot be told not to go
     into a public establishment, only
     by a court order ....*

10       A.    Yes.

11       Q.    How did you do that?

12       A.    I'm sorry?

13       Q.    What method do you use to informing someone

14   they are not welcome in an establishment?

15       A.    I informed Mr. Cardone it's the management's

16   wishes he do not return back to the property.

17       Q.    Did you give him anything in writing that

18   said that?

19       A.    No, I did not.

20       Q.    Are you sure he understood you?

21       A.    Yes.

22       Q.    When you had this interaction with

23   Mr. Cardone, did he give you any problems?

DAVID WASHINGTON
Official Court Reporter

40

JUDSON - REDIRECT

1    A.    No, he did not.

2              MR. ABRAM:  No further questions.

3              THE COURT:  Any other questions?

4              MS. RYAN:  Just one.

5                    REDIRECT EXAMINATION

6    BY MS. RYAN:  *more than one*

7         Q.    You indicated Mr. Cardone was on a bicycle;

8    is that correct?

9         A.    That's correct.

10        Q.    He was riding the bicycle when you contacted

11   him?

12        A.    I'm not certain.

13        Q.    Did you ever see him riding the bicycle?

14        A.    I saw him riding the bicycle prior to

15   contacting him.  He was riding on the side of the road

16   and he went into the parking lot of the Henlopen

17   Junction.

18        Q.    The public bathrooms, you indicated there was

19   one in the park right next to the Royal Farms?

20        A.    I believe there is a public restroom.

21        Q.    Are there other public bathrooms in Rehoboth?

22        A.    Yes.  At the time there was one at 1st and

23   Rehoboth.  *Almost a mile away*

DAVID WASHINGTON
Official Court Reporter

1    Q.    How big is Rehoboth, your jurisdiction?

2    A.    One square mile. ── *He went past his jurisdiction to give me a ... in public*

3          THE COURT:  I have nothing further.

4          MS. RYAN:  Nothing further.

5          THE COURT:  Call your next witness.

6          Thank you.  You are excused.

7                                    (Witness steps down.)

8          MS. RYAN:  Your Honor, may we approach?

9          THE COURT:  Yes.

10         (Whereupon, counsel approached the bench and

11      the following proceedings were had:)

12         MS. RYAN:  I know I control order, but I

13    wanted to let the Court know we are proceeding in a

14    chronological matter.  I have a witness that needs to

15    get back to work.  I'm going to jump out of order.  I

16    will jump to the end instead of continuing on.

17         THE COURT:  Sure.

18         (Whereupon, counsel returned to the trial

19      table and the following proceedings were had:)

20         MS. RYAN:  The State calls Gladys Taylor.

21                   GLADYS TAYLOR ──

22    was called as a witness by and on behalf of the State

23    of Delaware and, having been first duly sworn, was

TAYLOR - GLADYS

42

1   examined and testified as follows:

2                    DIRECT EXAMINATION

3   BY MS. RYAN:

4        Q.   Ms. Taylor, where do you work?

5        A.   I work at the 7-Eleven in Rehoboth Beach on

6   Rehoboth Avenue.

7        Q.   Were you working at the 7-Eleven on

8   September 6, 2004?

9        A.   Yes.

10       Q.   Do you recall an incident which occurred on

11   September 7th of 2004 within the 7-Eleven?

12       A.   Yes.

13       Q.   Can you describe what happened?

14       A.   The gentleman, Mr. Cardone, came in the

15   7-Eleven and I could tell he had been drinking because

16   he sort of weaved a lot, you know, walking.  He went

17   straight to the coffee aisle and I watched him because

18   I was hoping he didn't get sick.  I was talking with

19   my granddaughter and her boyfriend.  He took his time.

20   And then a couple minutes went by and three Rehoboth

21   police officers came past the window and came in.

22   They walked back to the coffee aisle where they found

23   him.

TAYLOR - GLADYS

1      Q.    You indicated you were talking with your

2    granddaughter?

3      A.    And her boyfriend.

4      Q.    Physically present or talking to them on the

5    phone?

6      A.    They were present.  They were physically

7    present.  I told them to get back because there might

8    be a problem.  Mr. Cardone was making himself a cup of

9    coffee when the police officers got there.  The one

10    police officer told him --

11      Q.    Let me back you up.  Can you describe the

12    individual that came in, his appearance?

13      A.    Dressed casual.  Had a big smile on his face.

14    Like I said, it was obvious he had been drinking by

15    the way he walked because he weaved.

16      Q.    Did he have anything other than the coffee,

17    was he carrying anything or have anything on him?

18      A.    I don't believe so.  I didn't recall anything

19    being with him at that time.

20      Q.    You indicated that there were three police

21    officers that came in?

22      A.    Correct.

23      Q.    You told your granddaughter and her boyfriend

TAYLOR - GLADYS

1    to do something?

2        A.    I told them to get back away from the aisle.

3    I said, there might be a problem.

4        Q.    Were there any other customers in the store?

5        A.    None.

6        Q.    Were you able to hear what, if anything,

7    occurred between the police officers and the

8    individual who was getting coffee?

9        A.    Some things I did hear, yes.  The police

10   officer asked Mr. Cardone to sit down his coffee,

11   which he had a large hot coffee in his hands.  Then

12   the officer asked him to please -- well, I don't know

13   whether he said please or not.  That's me.  He said:

14   Take off your headphones.  *She heard only what she wanted to hear..*

15       Q.    Headphones?

16       A.    He was listening to the radio or telephone.

17       Q.    He had something on his head?

18       A.    Yes.

19       Q.    He didn't respond?

20       A.    He just looked at them.  They repeated again

21   to remove the headphones.  The officer brushed the

22   headphones of the top of his head.  He said:  Sit the

23   hot coffee down.  He must have told him this three or

TAYLOR - GLADYS

1     four times to sit the hot coffee down.  Then the

2     police officer reached over and pushed the coffee out

3     of his hand, away from the other officers.  Then

4     again, he asked him repeatedly to keep his hands up,

5     away from his pocket, which he wouldn't do.  He kept

6     trying to lower his hands in his pockets.  Eventually,

7     the officer moved in and put his hands behind him to

8     get him out of the store.

9          Q.   How did the individual react when the officer

10    moved in?

11         A.   Pretty sure he was mumbling something.  I

12    never really caught what he said, but the police

13    officers, after they had subdued him at the point they

14    put the handcuffs on him, put both arms behind him, he

15    sort of shrugged like, I really don't want to go where

16    you are going, I guess.  I know the officers got him

17    outside.  We have a small step off from the curb that

18    goes from the front of the sidewalk to the parking

19    lot.  I think he just fell over his feet and the

20    officers picked him up and put him in the squad car

21    and took him out, which I was quite relieved of that.

22         Q.   You indicated you could hear some of what was

23    being discussed.  Did you specifically hear the

TAYLOR - GLADYS

1    officers telling him to remove the headphones?

2         A.    Yes, ma'am.

3         Q.    On more than one occasion?

4         A.    On more than one occasion:  Remove the

5    headphones.  The officer didn't hit him hard because

6    the man's head never moved.  He brushed the headphones

7    off the top of his head.

8         Q.    With regard to the coffee, did you hear the

9    officers telling him to put the coffee down?

10        A.    At least three to four times.

11        Q.    Did he put the coffee down?

12        A.    No, ma'am.  The officer had to knock the

13   coffee out of his hand, like I said, away from the

14   other officers.

15        Q.    When the officers moved in to place handcuffs

16   on him, did they place handcuffs on him?

17        A.    Yeah.  I don't know whether they got both

18   sides of the handcuffs on or not.  I know the one

19   officer was trying to hold the hand behind him.

20        Q.    Was he having trouble doing that?

21        A.    Yes, he was sort of shrugging, wiggling.  I

22   think the main objective was to get him out of the

23   store before customers did come into the store.

DAVID WASHINGTON
Official Court Reporter

1    Q.    Was he, in any way, verbally making any kind

2    of noise or disturbance in the store?

3    A.    Not in the store.  When the officers were

4    with him, I heard something come from his mouth, but I

5    didn't make out exactly what it was.  It didn't sound

6    like it was very nice.  I didn't care to hear whatever

7    it was that came out of his mouth.

8    Q.    You don't specifically recall what it was?

9    A.    No, I don't.

10    Q.    This individual that came in the 7-Eleven on

11    September 6th that got the coffee, do you see him in

12    the courtroom?

13    A.    I think his beard is a little longer than it

14    was then.  He looks a lot more reserved than he did

15    then.

16    Q.    Are you indicating anybody in particular in

17    the courtroom?

18    A.    The gentleman with the blue vest and white

19    shirt on.

20    Q.    When you say "he looks a little more reserved

21    than he did then", were there some differences in the

22    way he was behaving then?

23    A.    Well, I can tell the gentleman is sober

DAVID WASHINGTON
Official Court Reporter

TAYLOR - CROSS

1    today.  When I saw him, he was walking, like I said,

2    he was walking down the aisle to the coffee, which is

3    maybe as far as me to you and to your left, and he was

4    having trouble making his steps.  His feet hit the

5    floor where his legs were going. *First she said I was weaving, then this)*

6            MS. RYAN:  I have nothing further.

7            THE COURT:  Mr. Abram.

8                    CROSS-EXAMINATION

9    BY MR. ABRAM:

10       Q.   When Mr. Cardone came in the store at first,

11   you didn't have any problems with him, did you?

12       A.   No.

13       Q.   And he just went over and got his coffee; is

14   that correct?

15       A.   Went over and got his coffee, yes.

16       Q.   You didn't ask your granddaughter and

17   boyfriend to step away at that time, did you?

18       A.   No.

19       Q.   You only asked them to step back when the

20   police arrived; is that right?

21       A.   Correct.

22       Q.   If the police hadn't arrived, would you have

23   called the police?

TAYLOR - CROSS

1    A.    If I kept my eye on him and he had done

2    anything out of the way, if he had stumbled with the

3    coffee or spilled something, then I would have

4    probably realized the man needed a little bit more

5    help, he needed to be taken away.

6    Q.    At the point that you saw him, had he done

7    anything that would make you call the police?

8    A.    No.

9    Q.    You said he was listening to headphones and

10   you don't know what he was listening to.  He had a

11   pair of headphones on?

12   A.    Headphones on his head.

13   Q.    You said you heard music coming out?

14   A.    I didn't say that.

15   Q.    You didn't say that?

16   A.    No, sir.

17   Q.    You didn't hear anything coming out of them?

18   A.    No, sir.

19   Q.    You said you heard some noises coming out of

20   Mr. Cardone?

21   A.    When Mr. Cardone was being -- after he was

22   apprehended to be removed from the store, I heard

23   mutterings from Mr. Cardone.  I didn't make them out.

DAVID WASHINGTON
Official Court Reporter

1    I was at the front register by the door where he would

2    be, maybe, at the chair behind you from me in the back

3    of the store.

4        Q.    That's about the same distance the police

5    were away from you, wasn't it?

6        A.    Yes, sir.

*She is trying to justify her lies*

7        Q.    You heard them?

8        A.    The police used them, used the command.

9    Mr. Cardone was not commanding.  The police were

10   apprehending this gentleman and I figured there had to

11   be some reason or they wouldn't be in here in the

12   force of three.  That's why I told my grandchildren to

13   get back away from the front of the store in case

14   there was a problem.

15       Q.    The police used a commanding tone right away

16   when they walked in?

17       A.    No.  One officer walked up to him and said:

18   Put the coffee down.  I believe I am saying this

19   correctly.  And then when he didn't respond, he said:

20   Remove your headphones or the head thing on his head,

21   which he didn't respond.  And after about the third,

22   maybe even the fourth command, he reached up and

23   flipped it off the top of his head, then he asked him

```
 1    to sit the hot coffee down on the counter.

 2         Q.   Was there anything that Mr. Cardone did

 3    himself that caused a disturbance in the Royal Farms?

 4         A.   I worked at the Royal Farms since I worked at

 5    the 7-Eleven --

 6         Q.   I'm sorry, anything that you saw.

 7              I withdraw the question.

 8              Did you see Mr. Cardone physically resisting

 9    the police?

10         A.   I did see Mr. Cardone trying to -- in other

11    words, he didn't just say:  Go ahead, I'm going out of

12    the store.  He sort of shrugged his shoulder in the

13    way of saying verbally:  I don't wish to go, is what I

14    saw.

15         Q.   Was he violent in any way?

16         A.   I don't think so, no.

17              MR. ABRAM:  I have no further questions, Your

18    Honor.

19              THE COURT:  Witness excused?

20              MS. RYAN:  Yes.

21              THE COURT:  Thank you, ma'am.

22                                   (Witness steps down.)

23              THE COURT:  Call your next witness.
```

*[Handwritten annotation at lines 5-6:]* DAVID Washington, the court reporter, is not transcribing correctly.

*[Handwritten annotation at line 15:]* NO

DAVID WASHINGTON
Official Court Reporter

KLEMENTS - DIRECT

52

1          MS. RYAN:  The State calls Joseph Klements.

2                    JOSEPH KLEMENTS

3     was called as a witness by and on behalf of the State

4     of Delaware and, having been first duly affirmed, was

5     examined and testified as follows:

*why wasn't Joe asked about the incident?*

6     BY MS. RYAN:

7          Q.   Mr. Klements, how are you employed?

8          A.   I am a manager of the Royal Farms in Rehoboth

9     Beach.

10         Q.   Were you managing the Royal Farms store in

11    Rehoboth Beach in September of 2004?

12         A.   I was.

13         Q.   On September 7, 2004, were you the manager of

14    the Royal Farms in Rehoboth? *why wasn't he asked if he was witness to what the State says I did?*

15         A.   I was.

16         Q.   Did the Royal Farms in Rehoboth have

17    surveillance?

18         A.   It does.

19         Q.   What kind of system did the Royal Farms have?

20         A.   We have a electronic system.  The cameras all

21    are electronically recorded onto a computer disc.

22         Q.   You indicated there are a number of different

23    cameras within the store?

53

KLEMENTS - DIRECT

1      A.   There are, yes.

2      Q.   On September 7th, 2004, did you have occasion

3   to make a copy of the surveillance for that evening

4   for the police?

5      A.   I did, yes.

6      Q.   Did you make a copy?

7      A.   I did.

8      Q.   Were you able to successfully take the

9   surveillance from your computer disc and place it on

10   some other component?

11      A.   Yes, it was placed on a DVD.

12      Q.   Did you turn that over to the police?

13      A.   I did.

14           MS. RYAN:   May I approach the witness, Your

15   Honor?

16           THE COURT:   You may.

17           MS. RYAN:   May I have this marked for

18   identification, please.

19           THE CLERK:   Marked as State's A for

20   Identification.

21   BY MS. RYAN:

22      Q.   Mr. Klements, I will hand you what was marked

23   as State's A for Identification and ask if you

KLEMENTS - DIRECT

1    recognize it?

2        A.    Yes, I do.

3        Q.    What do you recognize that to be?

4        A.    This is a case and the DVD that I created

5    that evening from our image system.

6        Q.    Do they appear to be in the same condition as

7    when you turned them over to the police?

8        A.    Pretty much, yes.    — what is different?

9            MS. RYAN:  Your Honor, may we approach?

10           THE COURT:  You may.

11           (Whereupon, counsel approached the bench and

12       the following proceedings were had:)

13           MS. RYAN:  Technology time.  I need a minute

14   to set up -- I need a few minutes to warm up.  I

15   haven't called the victim yet to explain what

16   happened.  I need to display the surveillance without

17   displaying the instrument and ask him whether or not

18   that's what he provided the police so we can look at

19   the actual disc.

20           THE COURT:  Are you objecting to the tape?

21           MR. ABRAM:  No.

22           MS. RYAN:  I'm just dotting the I's.

23           THE COURT:  Let him cross-examine him while

1    you are doing that.

2            MS. RYAN:  He was not there at the time.

3            MR. ABRAM:  I don't think I have any cross.

4            THE COURT:  No objection to move it in and

5    introduce it with the next witness?

6            MR. ABRAM:  Okay.

7            MS. RYAN:  Thank you.

8            THE COURT:  You can introduce it.  As soon as

9    you go back, mark it and move to introduce it if he is

10   not objecting to it.

11           MS. RYAN:  Okay.

12           (Whereupon, counsel returned to the trial

13       table and the following proceedings were had:)

14           MS. RYAN:  Your Honor, the State moves the

15   item that was marked as State's A for Identification,

16   introduce it into evidence as the State's first

17   exhibit.

18           MR. ABRAM:  No objection.

19           THE COURT:  It's admitted.

20           THE CLERK:  State's A for Identification is

21   now admitted as State's Exhibit No. 1.

22           MS. RYAN:  I have nothing further.

23           MR. ABRAM:  No questions, Your Honor.

_Ineffective Assistance of Counsel_ (handwritten annotation)

_Fucked up... that tape shows nothing... why didn't Abram point out nothing could be seen from it... because I didn't ... this ... see_ (handwritten annotation)

                    DAVID WASHINGTON
                Official Court Reporter

56

HUDSON - DIRECT

1          THE COURT:  You are excused, sir.  Thank you.

2                                    (Witness steps down.)

3          THE COURT:  Call your next witness.

4          MS. RYAN:  The State calls Letez Hudson.

5          THE COURT:  Do you want this thing to start

6     warming up?  Whatever you have to do.  We will take *Graves*

7     maybe one more witness.  You are moving fairly fast. *is hurrying to get this over.*

8                         LETEZ HUDSON

9     was called as a witness by and on behalf of the State

10    of Delaware and, having been first duly affirmed, was

11    examined and testified as follows:

12                     DIRECT EXAMINATION

13    BY MS. RYAN:

14         Q.   Mr. Hudson, were you employed in September of

15    2004?

16         A.   Yes, I was.

17         Q.   Where did you work in September of 2004?

18         A.   Royal Farms.

19         Q.   What was your job there?

20         A.   Clerk, cashier.

21         Q.   Were you working at Royal Farms on September

22    7, 2004?

23         A.   Yes, ma'am.

DAVID WASHINGTON
Official Court Reporter

HUDSON - DIRECT

1      Q.    Did something unusual happen during your

2   shift --

3      A.    Yes.

4      Q.    -- on the 7th?

5      A.    Yes.

6      Q.    Can you describe for the jury what happened?

7      A.    Well, that night I was working at the

8   register and I heard like a little banging noise at

9   one of the side entrances at our store, but the door

10  was locked.  As the person went around to the front, I

11  could see, you know, he might have been kind of drunk

12  the way he was walking.  He had a headset on his head,

13  like he was listening to some kind of music as he keep

14  at the door.  I approached him at the door to figure

15  out what was wrong and what I could help him with.  He

16  began to tell me that he was inside before, he came in

17  there and asked to use the bathroom.  The people said

18  the restroom they had was not public, so he had to go

19  somewhere else to use the bathroom.  I guess at that

20  point he got kind of hostile.  And I found out he         *Hearsay*

21  urinated on the sidewalk and they called the cops.

22     Q.    You found that out later?        *Sidewalk? I thought*

23     A.    Yeah.                            *it was the parking*

                                             *lot?*

DAVID WASHINGTON
Official Court Reporter

HUDSON - DIRECT

1      Q.   At the time that you were talking to this

2    person and you asked to help him, what did he say to

3    you?

4      A.   He told me somebody had called the cops on

5    him the night before.  He was like:  Is it you, is it

6    you, I want to find out who it was.  I'm telling him,

7    it wasn't me because I had not been working the night

8    before.  That's when he started getting, you know,

9    kind of hostile with me.  I think at that point I seen

10    him reach in his pocket and pull out the knife.  I

11    pretty much notified him, told him as I'm backing

12    away:  I'm calling 911.

13      Q.   You said he pulled out a knife?

14      A.   Yeah.

15      Q.   What kind of knife?

16      A.   Like a pocketknife.

17      Q.   Did he have any of the items out of the

18    pocketknife?

19      A.   I can't recall exactly what was out.  You

20    know, he reached in and pulled it out.  I backed away

21    too fast to see whether the blade was out or not.

22      Q.   You didn't see the blade out?

23      A.   No.

DAVID WASHINGTON
Official Court Reporter

HUDSON - DIRECT

59

1    Q.    What kind of pocketknife was it?  Can you

2    describe it, the color or anything like that?

3    A.    Vaguely I can remember -- I'm thinking it was

4    kind of tan, silver.

5    Q.    When he pulled this item out of his pocket,

6    what did he do with it in relation to you?

7    A.    I mean, he held it in his hand.  Then he

8    started to walk a little bit towards me.  By that

9    time, I was already in the back of the store.  I had

10   my cell phone.  That's when I was calling the cops.

11   Q.    What did you think was going to happen?

12   A.    I thought that he was going to try to come

13   out at me with the knife, try to stab me, that's why I

14   backed away.

15   Q.    Could you see this knife in his hand?

16   A.    Yeah, I saw the knife in his hand.

17   MS. RYAN:  I'd like this item marked for

18   identification purposes.

19   THE CLERK:  Marked as State's B for

20   Identification.

21   BY MS. RYAN:

22   Q.    Mr. Hudson, I will hand you an envelope that

23   has an item that's been marked as State's B for

DAVID WASHINGTON
Official Court Reporter

HUDSON - DIRECT

1    Identification and ask you to take a look in that

2    envelope and see if you recognize what is in the

3    envelope.  You can take it out, if you need to.

4        A.    Yeah.

5        Q.    Do you recognize that item?

6        A.    Yeah.

7        Q.    What's that item look like to you?

8        A.    A pocketknife.

9        Q.    Does it look familiar to you?

10       A.    Yes.

11       Q.    In what way?

12       A.    The size of it.

13       Q.    You indicated you backed away.  What did you

14    do after you backed away?

15       A.    Told him I was going to call the cops and I

16    took my cell phone out and dialed 911.

17       Q.    You had your own cell phone?

18       A.    Yes.

19       Q.    Does the store have phones?

20       A.    Yes, but the store phones was at the register

21    at the front.  He was at the front entrance of the

22    store.  So instead of me trying to run towards and go

23    past him, I went to the back of the store.

HUDSON - DIRECT

1    Q.    When you called 911, did you speak with a

2    dispatcher?

3    A.    Yes.

4    Q.    Does the Royal Farms have surveillance?

5    A.    Yes, they did have those at the time.

6    Q.    Were they operational on September 7th?

7    A.    Yes, it was.

8         MS. RYAN:  I am going to ask permission to

9    display State's Exhibit 1 to the jury.

10        THE COURT:  Yes.  If you would like, we can

11   break for lunch now and finish out -- *Graves is in a hurry and the jury can sense it.*

12        MS. RYAN:  No, it is ready, Your Honor.  I

13   was just asking him something.

14        THE COURT:  All right.

15        (Whereupon, State's Exhibit No. 1 was played

16       to the Court and jury.)

17   BY MS. RYAN:

18        Q.    Mr. Hudson, I am displaying something from

19   the Royal Farms.  Can you describe what is depicted in

20   this image?

21        A.    That's the front entrance of the store.

22        Q.    You indicated in your testimony you heard

23   some kind of noise?

DAVID WASHINGTON
Official Court Reporter

HUDSON - DIRECT

62

1      A.    Yes, the noise came from the back door all

2   the way in the back of the store.

3           MS. RYAN:   Your Honor, I would ask for the

4   laser pointer.

5   BY MS. RYAN:

6      Q.    I am going to advance this in time and I ask

7   you to let me know when you see yourself, if you see

8   yourself.

9      A.    That's me.

10     Q.    That's you?

11     A.    Yes.

12     Q.    What are you doing here?

13     A.    I am looking as the man is walking from back

14  there to the front.

15     Q.    Now, that individual that just walked through

16  there, do you recognize that individual?

17     A.    Yes, ma'am.

18     Q.    Is he the one you described in your testimony

19  that you talked to that night?

20     A.    Yes.

21     Q.    Do you see him in the courtroom?

22     A.    Yes.

23     Q.    Where is he?

HUDSON - DIRECT

1      A.    Right there. (Indicating.)

2      Q.    Can you tell me what he's wearing?

3      A.    Black vest, white shirt.

4            MS. RYAN:  Your Honor, may I approach the

5      witness?

6            THE COURT:  Yes.

7      BY MS. RYAN:

8      Q.    Mr. Hudson, I have the laser pointer here.

9      If you push the red button you can indicate things on

10     the screen.  Can you indicate with the pointer the

11     area where you heard the noises before you walked over

12     to the other part of the store?

13     A.    (Witness complies.)

14     Q.    Back there?

15     A.    Yes.

16     Q.    Is the door open or accessible to the public?

17     A.    It is during the day.  As it gets later,

18     dark, we lock the doors.  *It was not dark*

19     Q.    You indicated you heard something back there

20     first?

21     A.    Yes.

22     Q.    I am going to advance this basically second

23     by second.  Did you have a conversation with him at

DAVID WASHINGTON
Official Court Reporter

HUDSON - DIRECT

1    this point?

2        A.    I think the conversation started as he got

3    into view more.

4        Q.    You are talking to somebody here?

5        A.    That is probably him.  Yeah, I am talking to

6    him.

7        Q.    Is this the period where you are discussing

8    what had occurred the night before?

9        A.    Yes.

10        Q.    He asked you whether you had called the

11    police?

12        A.    Yeah.

13        Q.    Had you been in there the night before?

14        A.    No.

15        Q.    What's happening there?

16        A.    He has the knife and he's coming at me.

*why wasn't Hudson asked to point out the knife I allegedly had in my hand?*

17        Q.    What is happening there?

18        A.    I'm going to the back of the store to call

19    911.

20        Q.    Did you tell him you were going to call the

21    police?

22        A.    Yeah.

23        Q.    What's happening there?  Do you see yourself

HUDSON - DIRECT

1     there?

2         A.    Yes, I can see myself there.

3         Q.    What are you doing there?

4         A.    I guess I'm standing there watching him go

5     out.  I'm coming back around.  I'm thinking at that

6     point, he's done left and gone across the street.

7         Q.    Did you call the police?

8         A.    Yeah.  I was probably still on the phone with

9     them.

10             MS. RYAN:  Your Honor, may we approach for

11     scheduling? — what scheduling? why isn't this discussion on record?

12             THE COURT:  Yes.

13             (Whereupon, counsel approached the bench and

14     a discussion took place off the record.  After

15     which, counsel returned to the trial table and

16     the following proceedings were had:)

17             THE COURT:  All right.  Even though we are

18     not finished with this witness, it looks like a good

19     spot to break.  We will break for lunch.  I ask you to

20     come back at 1:30.  Please don't discuss the case with

21     anybody at all.  Freeze frame your thoughts to the

22     extent humanly possible.  Keep the juror badges on.

23     If anyone is talking about a case, move away from

1    them.  If that's not possible, identify yourself as a

2    juror and ask them not to talk about any case.  The

3    courthouse is full of cases and lawyers and

4    everything.  I don't want you to hear anything that

5    would possibly cause you to lose your ability to be a

6    fair and impartial juror.  If anything like that does

7    occur, let me know so you can share your experience

8    and we can talk about whether it impacts on your

9    ability to be a fair and impartial juror.  I will see

10   you back in about an hour.  You all are excused.  For

11   those of you that have your things, you may go or you

12   are also free to go back to the jury room as well.

13          (Whereupon, the jury left the courtroom.)

14          THE COURT:  I ask the correctional officers,

15   if you can keep him hear until they tell you the jury

16   has cleared the corridor.  I will see you all back and

17   you will get your mechanical stuff worked out.

18          (Whereupon, Court stood in recess.  Following

19      which, Court reconvened and the following

20      proceedings were had:)

21          THE COURT:  Counsel, I have been working on

22   the instructions at lunchtime.  I just want to touch

23   base.  Mr. Abram, are you going to want a Getz?

DAVID WASHINGTON
Official Court Reporter

HUDSON - DIRECT

*perjured testimony*

1   instruction on the prior bad act of the urination or *waive?*

2   do you wish to waive that?                          *Why did you
                                                        Get instruction*

3            MR. ABRAM:   I'll probably waive that.

4            THE COURT:   I think I would do the same if I

5   were in your shoes.

6            Ms. Ryan, on the disorderly conduct, when I

7   was going through the instructions, the disorderly

8   conduct, what is the conduct?

9            MS. RYAN:   The conduct in the 7-Eleven, Your

10  Honor.   The police officers who were there will be

11  testifying to that.

12           THE COURT:   So there was disorderly conduct

13  and resisting arrest in the 7-Eleven?

14           MS. RYAN:   Correct.

15           THE COURT:   All right.   We will wait to see.

16  Thank you.

17           All right.

18           (Whereupon, the jury returned to the

19       courtroom.)

20           THE COURT:   You may continue your examination

21  of this witness.

22                  FURTHER DIRECT EXAMINATION

23  BY MS. RYAN:


                    DAVID WASHINGTON
                 Official Court Reporter

HUDSON - DIRECT

1      Q.    Mr. Hudson, you indicated that you called 911

2    from your cell phone?

3      A.    Yes.

4      Q.    Right after this incident happened on the

5    7th?

6      A.    Yes.

7            MR. ABRAM:   May we approach, Your Honor?

8            THE COURT:   Yes.

9            (Whereupon, counsel approached the bench and

10        the following proceedings were had:)

11           MR. ABRAM:   I want to make sure this isn't

12    the one that has the 16 minutes of dead time on it.

13           MS. RYAN:   I will play the first part of

14    Mr. Hudson's conversation with the dispatcher.

15           MR. ABRAM:   Okay.

16           MS. RYAN:   I mean, I'm not playing the whole

17    thing.  I am playing the beginning part of the

18    conversation.

19           THE COURT:   Remember. if you introduce it

20    into evidence, if there is anything else on this, it

21    can't be on there.  Otherwise, we will just hear it

22    and I will not send it back. ? where ?

23           MS. RYAN:   I can probably get one to trade,

HUDSON - DIRECT

1    copy it.

2              THE COURT:  That is up to you.  If you want _jury_

3    it to go back with them, I'm not letting them have it

4    if anything else is on the tape.  You make that

5    decision.  _what else is on the tape_

6              MS. RYAN:  Okay.  My intention is only to

7    play the beginning portion of it.  There was a lot of

8    transmissions between this dispatch.

9              THE COURT:  I don't want them to get anything

10   Mr. Abram and I haven't heard in the courtroom.

11             MS. RYAN:  If I send something back, I do not

12   have it right now.  I will have to go back to the

13   office and have someone make it.

14             THE COURT:  Just remember this, if he's not

15   testifying, we might get to the jury this afternoon,

16   it looks to me.  _he is still in a hurry, he is shortchanging me._

17             MS. RYAN:  I don't necessarily have to put it

18   in.  I can just mark it and play it for the jury.

19             THE COURT:  You can mark it for

20   identification.  You can make it an exhibit.  I am not

21   sending it back unless you clean it up.

22             MS. RYAN:  That's fine.

23             (Whereupon, counsel returned to the trial

DAVID WASHINGTON
Official Court Reporter

HUDSON - DIRECT

1        table and the following proceedings were had:)

2              THE COURT:  Are you moving --

3              MS. RYAN:  The State moves this CD as the

4    State's next exhibit.

5              THE CLERK:  Admitted as State's Exhibit No.

6    2. *— Did they ask to see the tape? If they did & Groves told them they could not see it,*

7              MR. ABRAM:  No objection, Your Honor.  *vacate the*

8              THE COURT:  This is what, the 911 matter?  *verdicts*

9              MS. RYAN:  Correct.

10             (Whereupon, State's Exhibit No. 2 was played

11         to the Court and jury.)

12   BY MS. RYAN:

13       Q.   Mr. Hudson, when this person in the orange

14   tank top contacted you and you talked with him in the

15   store, you indicated that he had a pocketknife both on

16   the 911 tape and in your testimony.  Were you

17   concerned about what he was going to do with that

18   knife?

19       A.   Yes.

20       Q.   In what way, how were you concerned?

21       A.   Whether or not he was going to try to cut me

22   with it or actually use the knife on me.  *? How could I cut him if the blade wasn't out?*

23       Q.   In response to that, what did you feel?

DAVID WASHINGTON
Official Court Reporter

HUDSON - DIRECT

1    A.    In response to me feeling threatened by him

2    doing that?

3    Q.    Yes.

4    A.    That's the point I had backed away from him

5    immediately and ran to the back of the store to call

6    911.

7    Q.    Did you speak with police officers at the

8    time of this incident after this incident occurred?

9    A.    Yes, I did speak with the police officers.

10    Q.    Did you tell the police officer what had

11    occurred?

12    A.    Yes.

13    Q.    When you spoke with the police officer, were

14    you telling them the truth about what had occurred?

15    A.    Yes.

16    Q.    When you talked with the police officer, were

17    you voluntarily talking with the police officer?

18    A.    Yes, ma'am.

19          MS. RYAN:  Your Honor, may we approach?

20          THE COURT:  Yes.

21          (Whereupon, counsel approached the bench and

22      the following proceedings were had:)

23          MS. RYAN:  Your Honor, I have laid the

HUDSON - DIRECT

72

1    foundation for 3507 for Mr. Hudson's statement to

2    Officer Whitman.  The police report and Officer

3    Whitman indicates the witness told him he pulled out

4    the pocketknife, he said he unfolded it.  The witness'

5    testimony is somewhat unclear on this point.  I have

6    Officer Whitman here prepared to testify.  I will let

7    the Court and Mr. Abram figure out the logistics.

8         THE COURT:  First of all, she laid the

9    foundation on 3507.  And as far as the logistics, if

10   you disagree, you can make an exception in a moment,

11   Mr. Abram.  Historically, how 3507 questions have been

12   resolved is that the lawyer wants to cross-examine the

13   witness now and then allow the 3507 statement to come

14   in and then recross-examine the witness if he wants.

15   The State is obligated to keep him here and put him

16   back on the stand.  The Supreme Court, in some of its

17   case law, in the particular case law, the defense was

18   put to a particular disadvantage in how that was done

19   in that particular case and suggested that while the

20   person is still on the stand, I interrupt the

21   testimony, take the 3507 testimony from the third

22   party, cross-examine that party, and then go back to

23   the original witness.  That's a preference that is

73

1    always left to the defense counsel.  If it is the

2    State asking for it, I basically say whoever the

3    proponent is doesn't get the choice.  Do you want to

4    do what I call the regular way and cross-examine and

5    then get another opportunity after the 3507 statement

6    comes in or do you want everything in before you

7    cross-examine him?

8         MR. ABRAM:  The regular way is fine, Your

9    Honor.

10        THE COURT:  Any exceptions to the 3507?  It

11   looks like she laid the foundation.

12        MR. ABRAM:  No.

13        THE COURT:  All right.

14        MS. RYAN:  When Officer Whitman testifies, he

15   has other things to testify to, but that portion, the

16   3507 though, do we have Mr. Hudson coming into the

17   courtroom?

18        THE COURT:  Do you want him inside the

19   courtroom or outside the courtroom?

20        MR. ABRAM:  Outside the courtroom.

21        MS. RYAN:  Thank you.

22        (Whereupon, counsel returned to the trial

23        table and the following proceedings were had:)


                    DAVID WASHINGTON
                 Official Court Reporter

HUDSON - CROSS

74

1    BY MS. RYAN:

2        Q.   Mr. Hudson, do you still work at Royal Farms?

3        A.   No.

4        Q.   Why don't you work there any more?

5        A.   Because I had another job opening at the

6    YMCA, which is where I work right now.

7              MS. RYAN:  I have nothing further.

8              THE COURT:  Cross.

9              MR. ABRAM:  Thank you, Your Honor.

10                    CROSS-EXAMINATION

11   BY MR. ABRAM:

12        Q.   I want to clarify some of your remarks.  You

13   say you saw a pocketknife?

14        A.   Yes.

15        Q.   Do you know about how big it was?

16        A.   It wasn't very big.  It was maybe about two

17   to three inches maybe.

18        Q.   But you didn't see anything pulled out of the

19   knife?

20        A.   No, I didn't see the blade pulled out of the

21   knife, but I saw a pocketknife.

22        Q.   So it was in a closed position?

23        A.   Yeah.

DAVID WASHINGTON
Official Court Reporter

HUDSON - CROSS

1      Q.    Was there ever any verbal threat of violence

2   towards you?

3      A.    No, but his voice took a tone like he was

4   maybe trying to be a little, you know, maybe threaten

5   me.

6      Q.    But there was no actual verbal threat?

7      A.    No.

8      Q.    We saw on the screen that you turned and left

9   Mr. Cardone's presence.  Did he follow you down there

10  when you left?

11     A.    No, he didn't follow me down there.

12     Q.    He didn't come after you with the knife or

13  anything?    *Pg 76 9-20*

14     A.    No, not at that point.  *what point? confused*

15     Q.    After he left your presence, did you have any

16  other interaction with him?

17     A.    Not in the beginning, no.  When I first

18  walked by, went past him to see what his actions were

19  going to be, that's when I left him.  When I turned

20  around and approached towards the front, that's when I

21  began to talk about whether or not can I help him or

22  anything like that.  That's how he got involved in the

23  story about what happened the night before.

HUDSON - CROSS

1    Q.    Do you have any idea how long he was talking

2    to you about what happened the night before outside?

3    A.    A couple minutes top.

4    Q.    Do you mean minutes top, it was that long?

5    A.    Yeah.

6    Q.    We heard on the 911 tape you said he came at

7    you.  Is that an accurate description of what

8    happened?

9    A.    Yeah, I would say so.

10    Q.    You think he came at you?

11    A.    Yes.

12    Q.    How would you describe him coming at you?

13    A.    He had the pocketknife in his hand and was

14    walking towards me, kind of like speeding up a little

15    bit, which is why I backed and turned away from him.

16    Q.    Did he leave the store right away?

17    A.    No, not right away. — *contradiction*

18    Q.    What did he do when he was still in the

19    store?

20    A.    He stood by the coffee bar.  He was saying

21    some kind of stuff.  I couldn't hear everything he was

22    saying.  As I was saying I was calling the cops, he

23    was making his remarks.  I think I heard one thing he

HUDSON - CROSS

1    said:  He doesn't care who I called or whatnot.  He

2    was saying more stuff while I was on the phone talking

3    to the lady, so I didn't hear anything.

4       Q.   He left the store then?

5       A.   Yeah.

6       Q.   He didn't threaten you any more?

7       A.   No, not after that.

8       Q.   I want the clarify:  How long do you think he

9    was speaking with you?

10      A.   I'd say probably a couple minutes at the

11   most.

12      Q.   It is from when he entered the store or just

13   when you two were right next to each other?

14      A.   Just when we were right next to each other.

15      Q.   Now I am going to attempt to move it back to

16   the point of your first interaction inside the store.

17           (Whereupon, State's Exhibit No. 1 was played

18       to the Court and jury.)

19   BY MR. ABRAM

20      Q.   This is you going up to the front door; is

21   that correct?

22      A.   Yeah.

23      Q.   So you are counting not from now, but a

DAVID WASHINGTON
Official Court Reporter

HUDSON - CROSS

1    little farther in the future when you started talking

2    to him?

3          A.    Yeah, as I moved closer to the end of the

4    screen is when we first started talking.

5          Q.    Am I there yet?

6          A.    No.

7          Q.    Tell me when I am there.  Is that when you --

8          A.    Right here.

9          Q.    Can you read the times?  Actually I probably

10   can't.

11         A.    Is that 8:42?

12         Q.    Can you see the seconds on there?

13         A.    No, I can see the time, but I can't see the

14   seconds.

15         Q.    If you want to take a walk up there and take

16   a look at it.  Just go up and read the seconds on

17   there.

18         A.    38.

19         Q.    Okay, you can go back and have a seat.  So

20   you are saying you talked to him, I guess, until you

21   turned around and go down the aisle?

22         A.    Yes.

23         Q.    Let me see if I can move forward to that.  Is

1      that about when you were done talking?

2          A.    Yeah.   It's about, yeah.

3          Q.    Can you read the timing this time?

4          A.    Can I read what now?

5          Q.    Can you -- the time you read before?

6          A.    8:43.

7          Q.    Can you see the seconds?

8          A.    04.

9          Q.    So how long is that actually that you are

10     talking to him?   About 26 seconds?   *We said all this in 26 seconds?*

11         A.    Yeah.                           *No way*

12         Q.    Do you recall seeing headphones on

13     Mr. Cardone?

14         A.    Yeah, I did.

15         Q.    Did you hear any music or anything coming out

16     of those?

17         A.    No, I didn't hear any music.

18         Q.    Did you have trouble communicating with him?

19         A.    Yeah, I think I did until he took the things

20     off his head.

21         Q.    You did until he took the things off his

22     head?

23         A.    Yeah.


DAVID WASHINGTON
Official Court Reporter

HUDSON - REDIRECT

1          MR. ABRAM:  No further questions, Your Honor.

2                    REDIRECT EXAMINATION

3    BY MS. RYAN:

4          Q.    Mr. Hudson, so in the time from 8:42:38 to

5    8:43:04, that short period of time you had a  *26 seconds*

6    conversation with Mr. Cardone; is that correct?

7          A.    Yes.

8          Q.    And during -- at the end of that he pulled

9    out the pocketknife?

10         A.    Yeah.

11         Q.    During that 26 seconds, he said to you what

12   you testified before, that he had been there the night

13   before?

14         A.    Yes.

15         Q.    So you were talking -- you are both talking?

16         A.    Yeah, we were both talking.

17         Q.    Did you know what he was talking about the

18   night before at that time?

19         A.    No.

20         Q.    Are you wearing a uniform when you work at

21   Royal Farms?

22         A.    Yeah.

23         Q.    What is your uniform?

1    A.    That blue hat, blue shirt, black pants.

2    Q.    Does anything on that say Royal Farms on it?

3    A.    My hat.  My shirt does not.  My name tag.

4    Q.    During that brief time, he asked:  Was it you

5    who called the police; is that correct?    *She is leading him, why?*

6    A.    Yes.    *doesn't # bro m object?*

7          MS. RYAN:  I have nothing further.

8          THE COURT:  All right.  Excused, but you are

9    subject to recall.  So I ask to you wait outside,

10    okay?

11                              (Witness steps down.)

12          MS. RYAN:  The State calls Officer Tyler

13    Whitman.

14                    TYLER WHITMAN

15    was called as a witness by and on behalf of the State

16    of Delaware and, having been first duly sworn, was

17    examined and testified as follows:

18                    DIRECT EXAMINATION

19    BY MS. RYAN:

20    Q.    Officer Whitman, by whom are you employed?

21    A.    Rehoboth Police Department.

22    Q.    Were you employed with the Rehoboth Beach

23    Police Department in September of 2004?

WHITMAN - DIRECT

82

1      A.   Yes, I was.

2      Q.   Specifically on September 7, 2004, did you

3   have occasion to investigate an incident that occurred

4   at the Royal Farms?

5      A.   Yes, I did.

6      Q.   Did you speak to Letez Hudson concerning that

7   incident?

*He says on page 102 ① he spoke w/ Abbott, not Hudson*

8      A.   Yes, I did.

9      Q.   Did Mr. Hudson say to you at the time you

10  spoke with him whether or not he observed a blade on

11  that knife? *Hudson*

12     A.   Yes, he did.

13     Q.   What did he exactly say? —

*Pg 83 ② he says he doesn't remember but here he does remember*

*Pg 58 - 22+25*

14     A.   He said he had observed the defendant pull

15  his knife out and unfold the blade opening the knife.

16     Q.   Did you interview Mr. Hudson that evening?

17     A.   Yes, I did.

18     MS. RYAN:  Your Honor, I have nothing further

19  of this witness at this time.

20     MR. ABRAM:  Thank you, Your Honor.

21              CROSS-EXAMINATION

22  BY MR. ABRAM:

23     Q.   Do you remember the specifics of this

DAVID WASHINGTON
Official Court Reporter

WHITMAN - CROSS

83

1    conversation?

2    A.    Vaguely.  It's been a little while.  I have

3    my notes or my report I can refer to.

4    Q.    Are you remembering that he told you that he

5    pulled the blade out in memory or your reports?

6    A.    I do remember he said he pulled out the

7    blade, unfolded it and displayed it to him. — Hudson
     denied that

8    Q.    Did he describe the blade to you?

9    A.    I didn't get that description.  He described

10   the knife as a black and silver knife.

11   Q.    Why didn't you get a description of the

12   blade?

13   A.    I didn't feel it was necessary to get the

14   description of the blade because, at that point, we

15   had already gotten the knife off the defendant. wrong

16        MR. ABRAM:   Okay.  No further questions, Your

17   Honor.

18        THE COURT:   Redirect?

19        MS. RYAN:   No, Your Honor.

20                              (Witness steps down.)

21        MS. RYAN:   May we approach?

22        THE COURT:   Yes.

23        (Whereupon, counsel approached the bench and

DAVID WASHINGTON
Official Court Reporter

84

1          the following proceedings were had:)

2              MS. RYAN:  Your Honor, the State at this

3      point has Mr. Hudson available if Mr. Abram wishes to

4      cross-examine him on the 3507 statement.

5              THE COURT:  Do you want to call that witness

6      for purposes of that?

7              MR. ABRAM:  Yes.

8              THE COURT:  All right.  Call him.

9              (Whereupon, counsel returned to the trial

10          table and the following proceedings were had:)

11             MS. RYAN:  The State recalls Letez Hudson.

12             (Witness previously sworn.)

13                  RECROSS-EXAMINATION

14     BY MR. ABRAM:

15     Q.    Mr. Hudson, do you remember making any

16     statements about the incident in question?

17     A.    My statements regarding?  You mean to who?

18     Q.    To the Rehoboth Beach Police.

19     A.    Yes.

20     Q.    Do you recall ever stating that you saw the

21     blade out?

22     A.    No, I don't recall that.

23     Q.    Do you have any memory of ever seeing the

                    DAVID WASHINGTON
                    Official Court Reporter

*Whitman lying about the blade*

85

```
 1   blade out?

 2       A.   No.

 3            MR. ABRAM:  No further questions, Your Honor.

 4            MS. RYAN:  I have nothing further.

 5            THE COURT:  Is he excused now?

 6            MS. RYAN:  Yes.

 7            THE COURT:  Thank you, sir.

 8                              (Witness steps down.)

 9            THE COURT:  Call your next witness.

10            MS. RYAN:  The State calls Wayne Abbott.

11                     WAYNE ABBOTT

12  was called as a witness by and on behalf of the State

13  of Delaware and, having been first duly sworn, was

14  examined and testified as follows:

15                   DIRECT EXAMINATION

16  BY MS. RYAN:

17      Q.   Mr. Abbott, who do you work for?

18      A.   The Sussex Family YMCA.

19      Q.   Did you have occasion to visit the Royal

20  Farms in Rehoboth on September 7, 2004?

21      A.   Yes, I did.  I went up to get coffee for

22  myself and my staff.

23      Q.   Do you recall what, if anything, occurred
```

ABBOTT - CROSS

1    when you went to the Royal Farms to get coffee?

2        A.    Yes.   I parked on the Rehoboth Avenue side,

3    went in through that door.   I walked in.   I noticed

4    there wasn't any employees around that I could see.

5    As I walked closer to the coffee counter, I saw a

6    gentleman standing there and I could hear him arguing

7    with another person.   And I looked over and saw the

8    store clerk another couple aisles past this gentleman

9    that was standing there by the other door.

10       Q.    Could you hear what the person who was

11   arguing was saying?   Could you hear what was being

12   said?

13       A.    I heard very little of it.   I heard the clerk

14   say he was going to call the police or 911.

15           MR. ABRAM:   Objection, Your Honor.

16           THE COURT:   Come up.

17           (Whereupon, counsel approached the bench and

18       the following proceedings were had:)

19           THE COURT:   I will sustain.   You don't have

20   the foundation for an excited utterance at this point

21   in time.

22           MS. RYAN:   Okay.

23           MR. ABRAM:   Thank you, Your Honor.

ABBOTT - CROSS

1          MS. RYAN:  Your Honor, may we approach?

2          THE COURT:  You may.

3          (Whereupon, counsel approached the bench and

4      the following proceedings were had:)

5          MS. RYAN:  Your Honor, I believe that I have

6    laid the foundation for the excited utterance as to

7    what the clerk said.  I believe the clerk testified as

8    to what he said, so --

9          MR. ABRAM:  That's fine.

10          THE COURT:  All right.

11          (Whereupon, counsel returned to the trial

12      table and the following proceedings were had:)

13    BY MS. RYAN:

14      Q.   Mr. Abbott, could you hear exactly what the

15    clerk said or the gist of what the clerk said?

16      A.   The gist of what the clerk said when I was in

17    the building, he needed to get out of the building or

18    he was going to call the police.

19      Q.   What was the response, if any, of the other

20    person?

21      A.   The other person said he didn't care who he

22    called.  It looked like he had something in his hands,

23    like a knife, waiving with his right hand when he was

DAVID WASHINGTON
Official Court Reporter

ABBOTT - CROSS

1    talking to the clerk.

2        Q.    Did you see a knife?

3        A.    It looked to be a knife, yes.  If it was open

4    or not, I'm not sure, but it looked like the handle of

5    a knife he had in his hand.

6        Q.    Could you see the blade of the knife?

7        A.    I don't remember seeing the blade open, no.

8        Q.    Was it a big knife or a little knife?

9        A.    A little knife, a pocketknife.

10        Q.    I will hand you what was marked for

11    identification as State's Exhibit B and ask if you

12    recognize it.  Do you recognize it?

13        A.    What I saw looked a little bigger than that,

14    but I do remember black, yes. — *It was not black – I never*

15        Q.    You said you saw it in his hand? *was allowed*

16        A.    In his hand. *to see the knife they claimed*

17        Q.    How was he holding his hand? *was mine.*

18        A.    He was like this with his hand. (Indicating.)

19        Q.    What, if anything, happened after you saw him

20    with the object in his hand?

21        A.    Right after that, I think he noticed I was in

22    the store and then he started making his way towards

23    that side door, then went out the door and headed

DAVID WASHINGTON
Official Court Reporter

ABBOTT - CROSS

90

1     towards the circle on Rehoboth Avenue.

2          Q.   Did you see whatever he had in his hand, what

3     he did with it?

4          A.   I didn't see what he did with it.  I waited

5     until he got outside the door.  I walked outside the

6     door too and waited for the police.

7          Q.   How far away from this person were you when

8     you saw him with this object in his hand?

9          A.   Probably a little closer than you and I right

10    now.  Maybe 15 feet.  I was on the other side of the

11    coffee counter.

12         Q.   You indicated that you walked in and you

13    didn't see any employees?

14         A.   Not right now -- I didn't see any employees

15    right away until I walked to the coffee.

16         Q.   What was your impression of this situation?

17         A.   I wasn't sure what was going on at first

18    until I heard the clerk say he was going to call.

19         Q.   Did you know that clerk?

20         A.   I've known him from going in there, yes.

21         Q.   You waited around until the police got there?

22         A.   I waited until the police got there.

23              MS. RYAN:  Your Honor, I am going to ask to

DAVID WASHINGTON
Official Court Reporter

1    show a portion of this to Mr. Abbott.

2    BY MS. RYAN:

3        Q.   Mr. Abbott, do you see that individual at the

4    door?

5        A.   Yeah, that's me.  That's my YMCA Triathlon

6    shirt I had on that night.

7        Q.   What was going on when you walked in the

8    store?

9        A.   That's what was going on when I walked in.

10   Now I walked off to the right toward the coffee.

11       Q.   Like that?

12       A.   Yes.

13       Q.   How did you know it was a knife?

14       A.   I looked like a knife in his hand, okay?

15   What I saw looked like a knife.  Honestly it looked

16   bigger than that at the time, but it looked like a

17   black knife he had in his hand.

18           MS. RYAN:  I have nothing further.

19                      CROSS-EXAMINATION

20   BY MR. ABRAM:

21       Q.   Mr. Abbott, when you saw everything you said

22   you were about 15 feet away?

23       A.   Yes.

DAVID WASHINGTON
Official Court Reporter

ABBOTT - CROSS

1       Q.    Was there anything between you and the

2    conversation?

3       A.    There was the coffee island right there.

4    There is a coffee island right there.

5       Q.    Was there anything on top of the island?

6       A.    No, because you had the coffeepot set, the

7    spaces on two sides and cream and sugar.  I had a

8    pretty straight view of what was going on.

9       Q.    You said you saw a knife.

10      A.    What I saw, what I saw in his hand looked

11   like an object that looked like a knife, but I didn't

12   see a blade.

13      Q.    So you are not positive it was a knife?

14      A.    I would say it was a knife, but I would also

15   say I wasn't one-hundred percent positive.  There was

16   an object in his hand.  He waived it like a knife.

17      Q.    How exactly?  You said he was waiving it in

18   the air?

19      A.    With his right hand up in the air.

20      Q.    Was in up high, down low?

21      A.    Up high, sir.  The clerk was on the other

22   side of the counter there.  I think he was trying to

23   show him.


DAVID WASHINGTON
Official Court Reporter

1       Q.    Okay.  So the interaction you are talking

2    about is after what we just saw?

3       A.    Yes, it was after that.

4       Q.    Okay.

5            MR. ABRAM:  I have no further questions, Your

6    Honor.

7            THE COURT:  Redirect, in any?

8            MS. RYAN:  No, Your Honor.

9            THE COURT:  Witness excused?

10           MS. RYAN:  Yes.

11           THE COURT:  Thank you, sir.

12                                   (Witness steps down.)

13           THE COURT:  Call your next witness, if any?

14           MS. RYAN:  The State calls Officer Paul

15    Parsons.

16                        PAUL PARSONS

17    was called as a witness by and on behalf of the State

18    of Delaware and, having been first duly sworn, was

19    examined and testified as follows:

20                    DIRECT EXAMINATION

21    BY MS. RYAN:

22       Q.    Sergent Parsons, where do you work?

23       A.    For the City of Rehoboth Police Department,

DAVID WASHINGTON
Official Court Reporter

PARSONS - DIRECT

1    Sussex County, State of Delaware.

2        Q.    Were you working for the Rehoboth Beach

3    Police Department in September of 2004?

4        A.    Yes, I was.

5        Q.    On September 7th of 2004, did you have

6    occasion to investigate an incident that occurred at

7    the Royal Farms?

8        A.    Yes.  I was not the investigating officer,

9    but still the shift supervisor.  My shift was working

10    that night. *asshole*

11        Q.    Do you recall who the investigating officer

12    was?

13        A.    I believe it was Officer Whitman.

14        Q.    Did you respond to the Royal Farms?

15        A.    Yes, I did.

16        Q.    Did you also respond to somewhere else?

17        A.    I went to the 7-Eleven on Rehoboth Avenue.

18        Q.    How close is the Royal Farms to the 7-Eleven?

19        A.    It's approximately 150, 200 yards.

20        Q.    When you responded to the 7-Eleven, what did

21    you observe?

22        A.    When I responded to the 7-Eleven, I observed

23    the clerk was there.  There was a gentleman, another

DAVID WASHINGTON
Official Court Reporter

PARSONS - DIRECT

95

what witness at
7-11?

1    gentleman there.  He was the witness prior to this.

2    He was there.  It was kind of late, so there wasn't a

3    lot of people inside the store.  And at that point in

4    time, there was other officers with us.

5        Q.   Who were the other officers, do you recall?

6        A.   Bonnie Ladd.  And I think Shannon Judson at

7    some point in time came there.  He was riding with

8    Bonnie Ladd that night.

9        Q.   Was Officer Whitman there?

10       A.   Not initially.  He was responding to the

11   complaint.

12       Q.   Did he come to the 7-Eleven?

13       A.   He went directly to the 7-Eleven first before

14   Royal Farms.

15       Q.   You initially went where?

16       A.   To the Royal Farms.

17       Q.   Did you eventually go to the 7-Eleven?

18       A.   I went to the 7-Eleven, yes.  I think I

19   misunderstood your question.

20       Q.   That's okay.  When you responded to the

21   7-Eleven, did you observe anyone in the 7-Eleven that

22   was possibly the suspect of the investigation?

23       A.   Yes, I did.  As soon as I walked in the door,

DAVID WASHINGTON
Official Court Reporter

PARSONS - DIRECT

1    I saw Officer Whitman talking to Charles Cardone, who

2    is sitting at the table in the blue sweater with the

3    white shirt.  They were at the back of the store by

4    the coffee machines and the Slurpee vending machines.

5         Q.   At some point did you have occasion to search

6    Mr. Cardone?

7         A.   I did.

8         Q.   Did you locate anything when you searched

9    Mr. Cardone?

10        A.   I did.

11        Q.   What did you locate?

12        A.   I believe it was in his pants pocket on his

13   right-hand side there was a small pocketknife.

14        Q.   I will hand you what was marked for

15   Identification as State's Exhibit B and ask if you

16   recognize what is in this envelope?

17        A.   Yes.

18        Q.   Is that the knife that you recovered from

19   Mr. Cardone?

20        A.   Yes.

21        Q.   From his pocket?

22        A.   Yes.

23        Q.   Can you pull the blade out of that knife, if

DAVID WASHINGTON
Official Court Reporter

PARSONS - DIRECT

97

1       there is one.

2          A.   (Witness complies.)

3          Q.   Thank you.

4               MS. RYAN:  Your Honor, I move this item in as

5       the State's next exhibit.

6               MR. ABRAM:  No objection.

7               THE COURT:  Admitted.

8               THE CLERK:  State's B for Identification is

9       now admitted as State's Exhibit No. 3.

10      BY MS. RYAN:

11         Q.   Officer Parsons, I want to show you something

12      and ask you if this is how Mr. Cardone appeared that

13      evening when you came into contact with him.

14              (Whereupon, State's Exhibit 1 was played to

15         the Court and jury.)

16      BY MS. RYAN:

17         Q.   Is that what he was wearing when you came in

18      contact with him?

19         A.   Yes.

20         Q.   When you said you recovered the knife, the

21      pocketknife in his pocket, which pocket are you

22      referring to?

23         A.   Its the cargo pants pocket that you can see

98

PARSONS - DIRECT

1       the bulging in his pant leg.

2              Q.    That's where you recovered it, that pocket?

3              A.    Yeah.

4              Q.    I will advance this a little bit.  See his

5       hand, right arm?

6                    MR. ABRAM:  Objection, Your Honor.

7                    THE COURT:  If you are asking him what he

8       sees, they can see it.

9                    MS. RYAN:  I want to ask him -- may we

10      approach?

11                   THE COURT:  Yes.

12                   (Whereupon, counsel approached the bench and

13          the following proceedings were had:)

14                   MS. RYAN:  It appears on the surveillance,

15      his pants, he puts this object in his pocket.  I want

16      to ask the officer if this is the pocket he found it.

17                   THE COURT:  Ask him:  Right front, left

18      front.  You have been leading him.  If you said -- you

19      will be leading him.  Ask him a question.  You are

20      leading him by that.  I will sustain the objection.

21                   (Whereupon, counsel returned to the trial

22          table and the following proceedings were had:)

23      BY MS. RYAN:

*Groves is giving her directions*

DAVID WASHINGTON
Official Court Reporter

99

1          Q.    Sergeant Parsons, was it his right pocket or

2     left front pocket that the knife was located in?

3          A.    It was on his right side.  I believe it was

4     the front pocket, but, you know, it was the right side

5     because we had brought Mr. Cardone out of the

6     7-Eleven.  He was resisting.  Officer Whitman had him

7     from behind, was on his left side.  I had

8     Mr. Cardone's right hand, the area which I started

9     searching first.  As to what exact pocket it was, I

10    believe it was the cargo pocket.  I could be wrong,

11    but it was his right side.

12         Q.    You recovered it from him?

13         A.    Yes.

14         Q.    You were on his right side?

15         A.    Yes.

16         Q.    You indicated Mr. Cardone was resisting.  In

17    what way was he resisting?

18         A.    He was struggling, trying to flail.  When I

19    was walking -- when I was initially walking in,

20    Officer Whitman was trying to talk to Mr. Cardone.  He

21    was not responding.  He kept, you know, when he asked

22    him a question, he was:  What, what, what, like that

23    to him.  And he was not listening to Tyler's commands.

100

PARSONS - CROSS

1           MS. RYAN:  I have nothing further.

2           THE COURT:  Cross.

3                    CROSS-EXAMINATION

4    BY MR. ABRAM:

5       Q.    You stated that Mr. Cardone kept saying:

6    What, what, to every question asked to him?

7       A.    He did state that, yes.

8       Q.    Is it possible he didn't understand what was

9    going on?

10      A.    No, it's not.

11      Q.    Why is that not possible he didn't understand

12   what was going on?

13      A.    In between saying the what, what, what

14   Mr. Cardone would come out and make a comment to Tyler

15   like he's cognizant of what was going on.

16      Q.    Did he have headphones on when you saw him in

17   these conversations?

18      A.    He did at the beginning, but was still

19   continuing to do that even when the headphones weren't

20   on his head.

21      Q.    Where exactly did you recover the knife?

22      A.    Out in front of the 7-Eleven.

23      Q.    It wasn't back at the station?

DAVID WASHINGTON
Official Court Reporter

*Report says different*

101

1    A.   It was in the front of the 7-Eleven.

2    Q.   Okay.

3        MR. ABRAM:  No further questions.

4        THE COURT:  Redirect, if any?

5        MS. RYAN:  No, Your Honor.

6        THE COURT:  All right.  Thank you, sir.

7                     (Witness steps down.)

8        THE COURT:  Call your next witness, if any.

9        MS. RYAN:  The State calls Officer Tyler

10  Whitman.

11        (Witness previously sworn.)

12             DIRECT EXAMINATION

13  BY MS. RYAN:

14    Q.   Officer Whitman, where do you work?

15    A.   For the Rehoboth Beach Police Department.

16    Q.   Were you working with the Rehoboth Beach

17  Police Department in September of 2004?

18    A.   Yes, I was.

19    Q.   On September 7, 2004, did you have occasion

20  to respond to the complaint at the Royal Farms?

21    A.   Yes, I did.

22    Q.   Where did you go first?

23    A.   I went to the Royal Farms very briefly, just

DAVID WASHINGTON
Official Court Reporter

WHITMAN - CROSS

*why did he contact Abbott and not Hudson?*

*102 contact*

1   long enough to contact Mr. Abbott. At which time, he

2   told me the defendant had gone across the circle, over

3   to the 7-Eleven. So I proceeded directly over there.

4   I believe that was when everyone else came on the

5   scene at the Royal Farms.

*if Hudson like talk to Hudson he testified*

6       Q.   But you went to the 7-Eleven?

7       A.   Yes.

8       Q.   When you went to the 7-Eleven, what, if

9   anything, did you observe?

10      A.   As I approached the 7-Eleven, I observed,

11  through the window, a white male wearing an orange

12  tank top and headphones standing back in the area of

13  the coffee pots.

14      Q.   That description was of some significance to

15  you in your investigation?

*Hudson called 911 why are they following Abbotto des cription?*

16      A.   Yes, that's the description I received from

17  Mr. Abbott of the subject.

18      Q.   Did you go into the 7-Eleven?

19      A.   Yes, ma'am.

20      Q.   You talked to this white male with the orange

21  tank top by the coffee?

22      A.   Yes.

23      Q.   What transpired when you contacted that

WHITMAN - CROSS

103

1    person?

2         A.    As I approached him, the dispatcher put out a

3    1039, which is a use caution because the subject was

4    reported as displaying a knife at the Royal Farms.

5         Q.    What happened?

6         A.    I approached Mr. Cardone.  He had his

7    headphones on, but they were back behind his ears.

8    They weren't actually on his ears.  I couldn't hear

9    any music coming from them.  I asked him to remove

10   them at least once, which he did not do.  He kind of

11   looked at me and looked away.  I attempted to speak to

12   him a couple more times, which it was appearing more

13   to ignore than not hear me.  At which time, I knocked

14   the earphones of his head to be certain he can hear me

15   and it wasn't the earphones impairing his ability to

16   hear me.

17        Q.    What happened then?

18        A.    I believe we had a brief exchange.  At that

19   point, I had asked him to put his coffee and bag down.

20   He responded with:  Huh.  And I asked him to do that a

21   couple of times.  I then grabbed him by the arm.  He

22   dropped the bag and his coffee.  At that point,

23   Sergeant Parsons and PFC Ladd entered the 7-Eleven and

*[Handwritten annotations: "He never said I was being placed under arrest. Nobody told me I was under arrest" (near lines 5-9); "He stated he couldn't hear any music coming from them" (line 16)]*

DAVID WASHINGTON
Official Court Reporter

WHITMAN - CROSS

1    helped me escort him out.

2         Q.   During the course of this contact with him,

3    when you grabbed his arm, what, if anything, did he

4    do?

5         A.   He attempted to pull away and continued to do

6    that as we were escorting him out of the store.  He

7    was also using some obscenities, cursing at us when we

8    escorted him out.  It got a little louder once we got

9    out in the parking lot. — *the Clerk said she didn't hear me say anything*

10        Q.   Did you handcuff him in the store?

11        A.   I honestly don't remember if I handcuffed him

12   in the store or if we did that once out on the

13   sidewalk.  I thought we did that in the store.

14        Q.   What reaction did he have to your handcuffing

15   him?

16        A.   He continued to pull his arms, hands and arms

17   away as I continued to try to pull his arms back.

18        Q.   You indicated he became louder outside the

19   store?

20        A.   Yes.

21        Q.   What, if anything, did you do once you got

22   outside the store?

23        A.   Once outside the store, we patted him, sat

DAVID WASHINGTON
Official Court Reporter

1   him down on the curb, patted him down to check to see

2   if we would find the knife he supposedly had.

3        Q.   Did you find the knife?

4        A.   No, I did not.

5        Q.   What did you do next?

6        A.   Once he was patted down, PFC Ladd -- as we

7   got him outside and started patting him down, PFC Ladd

8   got her vehicle, drove it around, and he was placed in

9   her vehicle and driven to the police department.

10       Q.   Did he cooperate being placed in the police

11  vehicle?

12       A.   As best I can remember, yes, he did.

13       Q.   Do you see the individual who you contacted

14  at the 7-Eleven here in the courtroom?

15       A.   Yes, I do.

16       Q.   Where is he?

17       A.   He is seated at the table over there wearing

18  the black vest and white shirt.

19            MS. RYAN:  I have nothing further.

20            THE COURT:  Mr. Abram.

21            MR. ABRAM:  Thank you, Your Honor.

22                    CROSS-EXAMINATION

23  BY MR. ABRAM:


                    DAVID WASHINGTON
                  Official Court Reporter

PARSONS - CROSS

1        Q.   Officer, I don't remember what the code

2   number was used.  You said you were supposed to come

3   up with caution?

4        A.   A 1039.  It's:  Use caution.

5        Q.   How exactly did you use caution when you came

6   upon Mr. Cardone?

7        A.   I was just cognizant of where his hands were.

8        Q.   You don't recall where you cuffed him, right?

9   You don't recall if it was inside or outside?

10       A.   That's correct.

11       Q.   So you walked him from inside the store even

12   though he allegedly had a knife on him?

13       A.   I had a hold of his hands by the wrists.

14       Q.   Both his hands?

15       A.   Either I had one and Sergeant Parsons had

16   one.  I believe that was the case.  I had his left arm

17   and Sergeant Parsons had his right arm.  Whether he

18   was handcuffed inside the store or outside, I know

19   that's the way we walked him out of the store.

20       Q.   On the way out, did you walk him past the

21   clerk working there?

22       A.   Yes, we did.

23       Q.   Did you see Mr. Cardone doing anything before

PARSONS - CROSS                    107

1    you walked in the store?

2         A.    He appeared to be fixing a cup of coffee.

3         Q.    He wasn't causing any problem when you walked

4    in?

5         A.    Not as I walked in, no.

6         Q.    Where exactly do you recall the knife being

7    found?

8         A.    I didn't find the knife.  Sergeant Parsons

9    found the knife.

10        Q.    Do you recall where Sergeant Parsons found

11   the knife?

12        A.    No, I do not.

13        Q.    You don't know?

14        A.    No.

15        Q.    Do you remember putting it in your police

16   report?

17        A.    I believe I put it in there.  Sergeant

18   Parsons found it, but -- I can refer to it if you

19   like.

20        Q.    Yeah, would you please.

21        A.    It says at R, Rehoboth Police Department,

22   Sergeant Parsons located the small pocketknife

23   matching the description to be the V one.

DAVID WASHINGTON
Official Court Reporter

PARSONS - CROSS

108

1    Q.    So you found it at the Rehoboth Beach Police

2    Department?

3    A.    That's what the report says.

4    Q.    It is that you found the knife at the

5    Rehoboth Police Department?

6    A.    That's what the report says.

7    Q.    Did you ever show the knife to Mr. Hudson?

8    A.    No, I did not.

9    Q.    You didn't.  Okay.

10        MR. ABRAM:  Your Honor, may I approach?

11        THE COURT:  You may.

12   BY MR. ABRAM:

13   Q.    Just for clarification, is that the knife in

14   question?

15   A.    Yes, it is.

16   Q.    Can you unfold the blade for me.

17   A.    (Witness complies.)

18   Q.    Approximately how long do you think that

19   blade is?

20   A.    Approximately two inches.

21   Q.    Approximately two inches?

22   A.    Yes, sir.

23   Q.    How wide do you think that blade is?

1      A.    Maybe an inch.

2      Q.    An inch wide, just the blade, not the knife

3    itself?

4      A.    Maybe a quarter of an inch, half inch,

5    somewhere in there.

6      Q.    Okay.

7            MR. ABRAM:  No further questions.

8            THE COURT:  Redirect, if any?

9            MS. RYAN:  I have nothing further.

10           THE COURT:  Thank you.

11                              (Witness steps down.)

12           THE COURT:  Next witness, if any?

13           MS. RYAN:  The State rests.

14           MR. ABRAM:  Your Honor, may we approach, Your

15    Honor?

16           THE COURT:  You may.

17           (Whereupon, counsel approached the bench and

18      the following proceedings were had:)

19           MR. ABRAM:  I'd like to make a motion for

20    directive verdict on some of the counts.  I assume we

21    shouldn't be doing that in front of the jury.

22           THE COURT:  You are right.  Proceed.

23           MR. ABRAM:  I don't have any witnesses.

DAVID WASHINGTON
Official Court Reporter

*How does he arrive at that conclusion?*

*110*

1    THE COURT:  If you want to make your motions,

2    make your motions now.  The State rested in front of

3    the jury.  Right now.

4    MR. ABRAM:  The aggravated menacing requires

5    a deadly weapon involved and deadly weapon under the

6    definition of law, if a pocketknife is under three

7    inches that is closed -- *Graves actually talked A brom*

8    THE COURT:  Carried in a closed position. *directed verdict on the aggr. men.*

9    MS. RYAN:  In a closed position.

10    MR. ABRAM:  The knife in question, all the

11    evidence, aside from one statement from one of the

12    officers, which is totally refuted by the witnesses, *GRAVES*

13    says the knife was closed at all times. *is showing*

14    THE COURT:  It is a question of fact.

15    Looking at it in the light most favorable to the *prejudice*

16    State, you have testimony it was open.  There is *and has my case for him*

17    testimony that he reacted to it. *Bias + Prejudice being removed*

18    MR. ABRAM:  Okay.  The disorderly conduct.

19    There is no evidence at all there is any disorderly

20    conduct involved in the 7-Eleven.  All the witnesses

21    said he was fine walking in the store.  I would think

22    all the actions in there are related to the resisting

23    arrest charge, not the disorderly conduct.

*How can I resist arrest when I was not told I was being placed under arrest?*

DAVID WASHINGTON
Official Court Reporter

111

```
 1          THE COURT:  When did he become disorderly?

 2    Is that out of the police officer's custody?

 3          MS. RYAN:  He didn't.

 4          THE COURT:  I will throw that one out.  Grant

 5    your relief.

 6          MR. ABRAM:  I have nothing further, sir.

 7          THE COURT:  I will take a short break.  I

 8    will tell them -- I'm not worried about typing the

 9    whole information at this time.

10          MR. ABRAM:  Do we want to address the jury

11    instructions now?

12          THE COURT:  If you have some instructions on

13    yours?

14          MR. ABRAM:  Yes.  Okay.

15          THE COURT:  But you need to rest.  After we

16    do this, go back, rest, and then we will go back and

17    do the jury instructions.

18          MR. ABRAM:  Okay.

19          (Whereupon, counsel returned to the trial

20        table and the following proceedings were had:)

21          MR. ABRAM:  Your Honor, the defense rests.

22          THE COURT:  All right.  Ladies and gentlemen,

23    what I have been told by the attorneys is that is the
```

*a judge telling my lawyer to rest is fucked up!*

*Graves told the attrys to rest*

DAVID WASHINGTON
Official Court Reporter

He told them to rest, she told
abram to rest...

112)

what transpired?

(what transpired?)

1   end of the evidence that you will get.)  I have been

2   working on some legal instructions.  I will give you

3   the charge.  I will go back in chambers now with the

4   lawyers and review that with them.  We will take our

5   afternoon break right now.  I hope to have this case

6   to you this afternoon in a short period of time.

7        Okay.  We will stay in session as the jury

8   returns to the jury room.

9        (Whereupon, the jury left the courtroom.)

10       THE COURT:  Okay, counsel, I will see you

11   back in chambers.  Bring what I've given you thus far

12   back.         why wasn't, or isn't, a record of what transpired

13       (Whereupon, Court stood in recess.  Following

14       which, Court reconvened and the following

15       proceedings were had:)

16       THE COURT:  All right.  You all have the

17   instructions.  I added the additional section  what?

18   Mr. Abram wanted.  Any exceptions to the instructions

19   as prepared, counsel?

20       MS. RYAN:  No, Your Honor.

21       MR. ABRAM:  No, Your Honor.

22       THE COURT:  All right.  Let's bring in the

23   jury.

DAVID WASHINGTON
Official Court Reporter

```
 1              MS. RYAN:  Before we bring in the jury, the

 2     911 call, I contacted my office.  They were not able

 3     to make a copy of the partial CD.  I wanted to make

 4     the Court aware of that.

 5              THE COURT:  I don't want the CD going back.

 6     The CD of the 911 stays out.

 7              MS. RYAN:  I will request if the jury

 8     requests to hear it again, they hear the portion.

 9              THE COURT:  We will bring them back into

10     court and we will play it.  We have a similar problem

11     with the CD.  They cannot play it except there.  The

12     equipment does not play it in the jury room.

13              MS. RYAN:  They have to know how to do it.

14              THE COURT:  I will tell them on both things.

15              MS. RYAN:  There is definitely other things.

16     Mr. Abram and I went over the surveillance rather

17     extensively.  There is nothing I would say more

18     helpful to the defendant.  — what does she mean?

19              THE COURT:  I don't want them to see anything

20     other than what they have seen in the court.  That

21     way, I don't have to worry if they see some kid buying

22     a pack of cigarettes.  what does he mean?

23              MS. RYAN:  There was a time frame span that
```

DAVID WASHINGTON
Official Court Reporter

1     goes several hours before and several hours after the

2     incident.  There is a lot else on this CD.  If they

3     wanted to watch it again, they can watch the portion

4     on that.  I believe both times we started, I believe

5     we started at 8:39.  I don't know that we went any

6     further than that, for four minutes after that.

7            THE COURT:  I will tell them if they want to

8     see the 911 tape, if they ask, we will bring them in

9     and play the portion with no testimony.  Play it and

10    send them back.

11           MS. RYAN:  Okay.

12           (Whereupon, the jury returned to the

13    courtroom.)

14           MS. RYAN:  Your Honor, we are going to do

15    instructions first, then closings?

16           THE COURT:  Yes.

17           MS. RYAN:  Thank you.

18           THE COURT:  Ladies and gentlemen, I am about

19    ready to start on the instructions that I will give

20    you.  I have reviewed those with the lawyers.  They

21    are familiar, likewise, before their closing

22    arguments, I do want to make you aware, normally once

23    something becomes an exhibit, you all get to take it


                        DAVID WASHINGTON
                     Official Court Reporter

*Graves is telling jury how difficult it is for them if they wish, or need, to hear the 911 tape and see the CD... That's fucked up.*

(115)

1    back to the jury room.  But the 911 tape and the CD

2    contains information that has a lot of other things

3    that are irrelevant to this trial.  So what I am

4    directing the lawyers to do, I told the lawyers if you

5    do want to hear the 911 tape again or if you want to

6    see the surveillance tape again from beginning to end,

7    I will bring you back in and, without testimony or

8    comment, play that because we have the equipment in

9    here to get it right to the point.  Like I say, there

10   is a lot of data on there that is not relevant.  It

11   would be a waste of time for you to see and since you

12   hadn't seen it all, I am going to screen those matters

13   in this fashion.  If you are like me, you could be in

14   there pushing buttons all day long and still not get

15   it right.  I am electronically challenged when it

16   comes to these things.

17          Members of the jury, you have now heard all

18   the evidence that will be presented in this case, and

19   in a few minutes, you will hear the arguments for the

20   State and defense.  I shall not review the evidence

21   that has been presented to you because you, the jury,

22   are the sole and exclusive judges of the facts of the

23   case, of the credibility of the witnesses, and of the

*plus, it is close to 4:00 PM, anybody would want to go home... why didn't Graves tell the jury to come back the following day?*

*From pages 115 - to 134 (19 pages at closing of the day) Graves is bending the jury's ears instead of letting them go home and deliberate the following...*

*he is doing just that*

DAVID WASHINGTON
Official Court Reporter

1    weight and value of the testimony of each witness.

2              I shall now instruct you as to applicable

3    principles of law governing this case.  No single one

4    of these instructions states all of the law applicable

5    to this case.  Therefore, you should listen to and

6    consider all of the instructions together in reaching

7    your verdict.  It is your duty as jurors to follow the

8    law as I shall state it to you.  You are not to be

9    concerned with the wisdom of any rule or law stated by

10   me in these instructions.  You must apply the law as

11   instructed even if you do not agree with that law

12   because it is the law of the State of Delaware as

13   enacted by the Legislature and it is applicable to

14   everyone.

15             It is your duty to determine the facts and to

16   determine them only from the evidence presented to

17   you.  You are to apply the law, as I will instruct

18   you, to the facts as you find them and, in this way,

19   decide the case.

20             If, in these instruction, any rule,

21   direction, or idea is stated in a manner which appears

22   to give it more significance than other instructions,

23   no such emphasis is intended by me, and none should be

1     inferred by you.

2          The defendant is charged with possession of a

3     deadly weapon during the commission of a felony,

4     aggravated menacing, resisting arrest, and criminal

5     trespass in the third degree.  The defendant has plead

6     not guilty to these charges.

7          The defendant comes before you by way of an

8     indictment filed by the State of Delaware.  The

9     indictment is a mere accusation against the defendant.

10    It is the charging document.  It is not, in itself,

11    any evidence of the guilt of the defendant and you

12    should now allow yourselves to be influenced in any

13    way, however slightly, by the fact that an indictment

14    has been filed in this case.

15          In these instructions, I will explain to you

16    the elements of the offenses charged in the

17    indictment.  The elements of an offense are those

18    physical acts, attendant circumstances, results and

19    states of mind which are specifically included within

20    the definitions of the offense in the Criminal Code.

21    If words are defined by the Criminal Code, I will give

22    you the Code definitions.  Otherwise, give words their

23    commonly accepted meanings.  I will also explain the

1    burdens of proof the law imposes upon the State, as

2    well as some other aspects of your function as jurors.

3    Then I will review the possible verdicts.

4         Count 1 charges Charles F. Cardone, on or

5    about the 7th day of September, 2004, in the County of

6    Sussex, State of Delaware, did knowingly possess a

7    deadly weapon, a knife, during the commission of

8    aggravated menacing, a felony, as set forth in Count 2

9    of the information, which is herein incorporated by

10   reference.

11        In order to find the defendant guilty of

12   possession of a deadly weapon during the commission of

13   a felony, you must find all of the following elements

14   have been established beyond a reasonable doubt: One,

15   there was a deadly weapon. Title 11 of the Delaware

16   Code defines deadly weapon as including a firearm, a

17   bomb, a knife of any sort other than an ordinary

18   pocketknife carried in a closed position, a

19   switchblade knife, billy, blackjack, bludgeon, metal

20   knuckles, slingshot, razor, bike chain, ice pick, or

21   any dangerous instrument which is used or attempted to

22   be used to cause death or serious physical injury.

23   Dangerous instrument means any article or substance

*Graves describes*
*602(a) Menacing*
*to confuse jury into thinking*

DAVID WASHINGTON
Official Court Reporter

*How can it deadly*
*weapon definition is included*
*in dangerous instrument*

*[handwritten notes at top of page:]* Orders actually purpose of deadly weapon on page 110
neither 602(a) or b) mention death or serious

```
 1    which, under the circumstances which it is used or
 2    attempted to be used, is readily capable of causing
 3    death or serious physical injury.  For the purpose of
 4    this definition, an ordinary pocketknife shall be a
 5    folding knife having a blade not more than three
 6    inches in length;  why did he add "for the purpose of the defin
 7              And, two, the defendant possessed the deadly   what deadly
 8    weapon.  Possession generally means dominion, control,  weapon
 9    and authority, but a person is in possession of a
10    deadly weapon within the meaning of this section only
11    when it is physically available and accessible to him
12    during the commission of a crime;
13              And, three, the defendant acted knowingly.
14    In other words, he was aware that he possessed a
15    deadly weapon;
16              And, four, the defendant possessed a deadly
17    weapon during the commission of a felony.  That is
18    aggravated menacing, Count 2, which I will review with
19    you in a moment.
20              If, after considering all of the evidence,
21    you find that the State has established beyond a
22    reasonable doubt that the defendant acted in such a
23    manner as to satisfy all of the elements which I just
```

DAVID WASHINGTON
Official Court Reporter

1   stated, at or about the date and place in question,

2   you should find the defendant guilty of possession of

3   a deadly weapon during the commission of a felony.  If

4   you do not so find, or if you have a reasonable doubt

5   as to any of the elements, you should find the

6   defendant not guilty of possession of a deadly weapon

7   during the commission of a felony. — the felony is aggr. menacin?

8          Count 2 charges aggravated menacing.

9   Mr. Cardone, on or about September 7th, 2004, in this

10  county and state, did intentionally place Letez Hudson

11  in fear of imminent physical injury by displaying what

12  appeared to be a deadly weapon, a knife, in violation

13  of Title 11, Section 602(b) of the Delaware Code.

14         Delaware Law defines the offense of

15  aggravated menacing, in pertinent part, as follows:  A

16  person is guilty of aggravated menacing when, by

17  displaying what appears to be a deadly weapon, the

18  person intentionally places another person in fear of

19  imminent physical injury.

20         In order to find the defendant guilty of this

21  charge, you must find the following elements have been

22  established beyond a reasonable doubt:  One, the

23  defendant displayed to Mr. Hudson what appeared to be

121

*It was not open therefore, it was not a deadly weapon*

1   a deadly weapon, a knife;

2          And, two, the defendant displayed the deadly

3   weapon intending to place Mr. Hudson in fear of *it was not the knife, weapon of just fear*

4   imminent physical injury.  A person acts intentionally

5   when it is his conscious object to engage in conduct

6   of that nature or cause that result.

7          If, after considering all of the evidence,

8   you find that the State has established beyond a

9   reasonable doubt that the defendant acted in such a

10  manner as to satisfy all of the elements which I just

11  stated, at or about the date and place stated in the

12  indictment, you should find the defendant guilty of

13  aggravated menacing.  If you do not so find, or if you

14  have a reasonable doubt as to any of these elements,

15  you should find the defendant not guilty of aggravated

16  menacing.

17          Count 3 alleges resisting arrest, that

18  Mr. Cardone, on September 7th, 2004, in this county

19  and state, did intentionally attempt to prevent a

20  police officer, Officer Ronald T. Whitman of the

21  Rehoboth Police Department, from effecting an arrest

22  by pulling away from said officer and attempting to

23  fight officers taking him into custody. *I was never told I was being placed under arrest*

DAVID WASHINGTON
Official Court Reporter

1       In order to find the defendant guilty of

2    resisting arrest, you must find that the State has

3    established beyond a reasonable doubt:  One, that the

4    defendant intentionally attempted to prevent the

5    police officer from effecting the arrest of himself by

6    pulling away from the officer and/or attempting to

7    fight officers taking him into custody.  A person acts

8    intentionally when it is his conscious object or

9    purpose to engage in conduct of that nature.

10       If, after considering all of the evidence,

11    you find that the State has established beyond a

12    reasonable doubt that the defendant acted in such a

13    manner, as to satisfy the element I just stated, at or

14    about the date and place stated in the indictment, you

15    must find the defendant guilty of resisting arrest.

16    If you do not so find, you must find the defendant not

17    guilty of resisting arrest or if you have a reasonable

18    doubt, you must find him not guilty.

19       Count 4 is criminal trespass, that

20    Mr. Cardone, on September 7, 2004, in this county and

21    state, did knowingly enter and remain unlawfully upon

22    real property, to wit:  The defendant did enter the

23    property of the Royal Farms store after being told not

DAVID WASHINGTON
Official Court Reporter

*He States to the JURY. I'm guilty*   123   *Royal Farms is a public place only a court ord can keep me out*

1   to return to the property of the Royal Farms store.

2   In order to find the defendant guilty of this

3   offense, you must find that the State has established

4   beyond a reasonable doubt:  One, the defendant entered

5   unlawfully upon real property, that being the Royal

6   Farms store.  The term "unlawfully" means without

7   authorization or permission.  Real property means any

8   property situated in this State or any interest in

9   such real property, including, but not limited to, any

10  leases of or mortgage upon such real property;

11  And, two, the defendant acted knowingly.  In

12  other words, he knew he was unlawfully entering the

13  Royal Farms store.

14  If, after considering all of the evidence,

15  you find that the State has established beyond a

16  reasonable doubt that the defendant acted in such a

17  manner as to satisfy all of the elements I just

18  stated, at or about the date and place stated in the

19  indictment, you must find the defendant guilty of

20  criminal trespass in the third degree.  If you do not

21  so find, or if you have a reasonable doubt, you should

22  find the defendant not guilty.

23  I have instructed you that an element of the

DAVID WASHINGTON
Official Court Reporter

1   offense charged is that the defendant acted with a

2   required state of mind, such as the defendant acted

3   intentionally or knowingly.  It is, of course,

4   difficult to know what is going on in another person's

5   mind.  Therefore, our law permits the jury to draw an

6   inference, in other words, to reach a conclusion about

7   the defendant's state of mind from the facts and

8   circumstances surrounding the acts the defendant is

9   alleged to have done.  In reaching this conclusion,

10  you may consider whether a reasonable person in the

11  defendant's circumstances would have had or lacked the

12  requisite state of mind or belief.  You should,

13  however, keep in mind at all times that it is this

14  defendant's state of mind which is at issue here, and

15  in order to convict the defendant, you are required to

16  find beyond a reasonable doubt that the state of mind

17  or belief required for guilt existed.

18          The law presumes every person charged with a

19  crime to be innocent.  This presumption of innocence

20  requires a verdict of not guilty unless you are

21  convinced by the evidence that the defendant is guilty

22  beyond a reasonable doubt.

23          The burden of proof is upon the State to

1   prove all the facts necessary to establish the crime

2   charged beyond a reasonable doubt.

3       Reasonable doubt is a practical standard.

4       On the one hand, in criminal cases, the law

5   imposes a greater burden of proof than in civil cases.

6   Proof that a defendant is probably guilty is not

7   sufficient.

8       In other words, there are very few things in

9   the world we know with absolute certainty.  Therefore,

10  in criminal cases, the law does not require proof that

11  overcomes every possible doubt.    ← contradictory

12      Proof beyond a reasonable doubt is proof that

13  leaves you firmly convinced of the defendant's guilt.

14  Therefore, based upon your conscientious consideration

15  of the evidence, if you are firmly convinced that the

16  defendant is guilty of the crime charged, you should

17  find the defendant guilty.  If, on the other hand, you

18  think this is a real possibility or, in other words, a

19  reasonable doubt that the defendant is not guilty, you

20  must give the defendant the benefit of the doubt by

21  finding the defendant not guilty.  Of course, you must

22  consider each of the charges separately and vote for

23  each of the charges separately.

DAVID WASHINGTON
Official Court Reporter

1              There are two types of evidence from which a

2       jury may properly find the facts of a case.  One is

3       direct evidence.  The testimony of an eyewitness is an

4       example of direct evidence.  The other in indirect or

5       circumstantial evidence; that is, the proof of facts

6       or circumstances from which the existence or

7       non-existence of other facts may reasonably be

8       inferred.  In this case, the State and defense have

9       relied, in part, upon circumstantial evidence.

10             It is not unusual in a criminal case to rely

11      upon circumstantial evidence.

12             To warrant a conviction, all of the evidence,

13      direct and circumstantial, must lead you to conclude

14      beyond a reasonable doubt that the accused committed

15      the offense or offenses charged. *or did not*

16             You, the jury, are the sole judges of the

17      credibility of each witness who has testified and of

18      the weight to be given to the testimony of each.

19             If you should find the evidence in this case

20      to be in conflict, then it is within your province to

21      reconcile the conflicts, if you can do so, as to make

22      one harmonious story of it all.  If you cannot

23      reconcile these conflicts, then it is your duty to

DAVID WASHINGTON
Official Court Reporter

1   give credit to those portions of the testimony which

2   you believe is worthy of credit, and you may disregard

3   that portion of the testimony which you do not believe

4   to be worthy of credit. *If jurors do not believe testimony, they*
    *do not disregard, they find not guilty.*

5           In considering the credibility of the

6   witnesses and in considering any conflict in

7   testimony, you should take into consideration each

8   witness' means of knowledge, strength of memory and

9   opportunity for observations, the reasonableness or

10  unreasonableness of the testimony, the consistency or

11  inconsistency of the testimony, the motive actuating

12  the witness, the fact, if it is a fact, that the

13  testimony has been contradicted, the witness' bias, or

14  prejudice, or interest in the outcome of the

15  litigation, the ability of the witness to have

16  acquired the knowledge of the facts to which the

17  witness testified, the manner and demeanor of the

18  witness while on the witness stand, the apparent

19  truthfulness of the testimony, and any and all other

20  facts and circumstances shown by the evidence which

21  may affect the credibility of the testimony.

22          There is a statute in this State that reads

23  as follows:  The fact that a criminal act was

    *what is the statute?*

DAVID WASHINGTON
Official Court Reporter

1    committed while the person committing such act was in

2    the state of intoxication, or was committed because of

3    such intoxication, is no defense to any criminal

4    charge if the intoxication was voluntary.

5         You have heard evidence of unsworn statements

6    of witnesses which occurred before trial.  Such

7    testimony is permissible under a provision of a *what is the Statute*

8    Delaware Statute which reads, in pertinent part, as

9    follows:  In a criminal prosecution, the voluntary

10   out-of-court statement of a witness who is present and

11   subject to cross-examination may be used as

12   affirmative evidence with substantive independent

13   testimonial value.  This rule shall apply whether the

14   witness' in-court testimony is consistent with the

15   prior statement or not. *Bullshit that is perjury*

16        With regard to this provision, caution must

17   be exercised by the jury when a conflict exists

18   between the out-of-court statement and the in-court

19   testimony, or when a conflict exists among the

20   out-of-court statements themselves.  The jury should

21   be particularly careful if there is no evidence to

22   corroborate an inconsistent out-of-court statement.

23   Nevertheless, the jury may convict on such a statement

DAVID WASHINGTON
Official Court Reporter

1    if the jury is satisfied beyond a reasonable doubt

2    that the statement is true.

3            You may have noticed that the defendant,

4    Mr. Cardone, is in custody.  When a person is accused

5    of a crime, it is not unusual that a person is

6    incarcerated from the time of his arrest until the

7    trial.  I instruct you that you must not, in any way,

8    infer that Mr. Cardone's incarceration is evidence of

9    guilt in this matter.

10           Also during the course of the trial and

11   during these instructions, Mr. Cardone may have been

12   referred to as the defendant.  This is a customary

13   designation in the Superior Court.  You must

14   understand, however, that this characterization does

15   not, in any way, suggest Mr. Cardone is guilty of any

16   of the crimes charged against him.

17           Each of these attorneys has a role; that is,

18   to zealously and effectively advance the claims of the

19   party he or she represents within the bounds of the

20   law.  Each attorney may argue all reasonable inference

21   from the evidence in the record.  However, it is not

22   proper for an attorney to state his or her personal

23   opinion as to the truth or falsity of any testimony or

*Nor is it proper for a judge to show bias and prejudice*

DAVID WASHINGTON
Official Court Reporter

1     evidence or state his or her personal opinion as to

2     the guilt or innocence of an accused.  What each

3     attorney personally thinks or believes about the

4     testimony or evidence in a case is not relevant, and

5     you are instructed to disregard any personal opinion

6     or belief concerning the testimony or evidence which

7     either attorney may have offered during the course of

8     the trial or in their opening statements or closing

9     arguments.

10          What each attorney tells you in the opening

11    statement or closing argument is not evidence.

12    Evidence consists of testimony from the witnesses

13    while testifying from the witness stand and the

14    exhibits that are introduced through their testimony.

15    It is this evidence and only this evidence which you

16    may consider in reaching your verdicts.

17          I instruct you that your verdict must be

18    based solely and exclusively on the evidence in the

19    case; that you cannot be governed by passion,

20    prejudice, sympathy, public opinion, or any motive

21    whatever except a fair and impartial consideration of

22    the evidence; and that you must not, under any

23    circumstances, allow any sympathy which you may have

1    or entertain for any of the persons involved in this

2    case to influence you to any degree in arriving at

3    your verdict.

4         The defendant has chosen not to testify.  The

5    defendant has a constitutional right to testify or not

6    testify as he chooses.  The fact that the defendant

7    did not testify must not be construed by you as an

8    indication that the defendant is guilty of the crimes

9    charged.  Like every other person charged with an

10   offense, this defendant is presumed innocent until

11   proven guilty beyond a reasonable doubt.

12        Furthermore, as I told you in the beginning

13   of the case, because the burden of proof is upon the

14   State to prove the existence of all the elements of

15   the crime beyond a reasonable doubt, the defendant is

16   not required to present any evidence in his own

17   behalf.  You shall not draw any inference of guilt or

18   innocence from the defendant's choice not to testify.

19        How you conduct your deliberations is solely

20   within your province.  However, I would like to

21   suggest that you discuss all the issues fully and give

22   all jurors a fair opportunity to express their views

23   before committing yourself to a particular view.  Each

1    of you has a duty to consult with each other with an

2    open mind and to deliberate with a view toward

3    reaching an agreement.  Each of you should decide the

4    case for yourself, but only after impartially

5    considering the evidence with your fellow jurors.  You

6    should not surrender your honest convictions solely

7    because of the opinions of your fellow jurors, or

8    merely for the purpose of returning a verdict, but you

9    should not hesitate in re-examining your own view and

10    change your opinion if you are persuaded by another

11    view.

12            The possible verdicts are as follows:  As to

13    Count 1, possession of a deadly weapon during the

14    commission of a felony, guilty as charged or not

15    guilty; as to Count 2, aggravated menacing, guilty as

16    charged or not guilty; as to Count 3, resisting

17    arrest, guilty as charged or not guilty; as to Count

18    4, the criminal trespass charge, guilty as charged or

19    not guilty.

20            All twelve jurors must unanimously agree to

21    any verdict returned by the jury.  Again, you must

22    consider and vote on each count separately.

23            To reach a verdict of guilty, you must find

133

```
 1    that the State has proved the elements of a particular

 2    offense unanimously and beyond a reasonable doubt.

 3            When you have agreed upon your verdicts,

 4    notify the bailiff.  The bailiff will inform you when

 5    to come back to the courtroom.

 6            When you come in to deliver the verdict, the

 7    clerk will ask the foreperson as to each charge, what

 8    is the jury's verdict.  Your foreperson will announce

 9    the verdict.

10            The Court does not get involved in the

11    appointing of foreladies or forepersons or foremen.  I

12    will let you decide if you want somebody basically

13    directing you or running your proceedings in

14    deliberations.  We do ask we know who the person is

15    that is reporting the jury's verdict.  Therefore, it

16    is the customary practice to ask the person that sits

17    in the No. 1 seat, ma'am, that would be you to deliver

18    the jury's verdict.

19            If you do not want to do that, you want to

20    pass it to somebody else, fine, just let the bailiff

21    know which juror it will be when you come in.  You

22    will get copies of these jury instructions because I

23    just gave you a mouthful.  I will send these back with
```

134

1    you.  It has a verdict sheet on it to mark things to

2    make it easier for you.  After reviewing it, you may

3    still have a question.  If you have a question, write

4    it out.  Whether I can answer you or not, I will still

5    bring you back in the courtroom and tell you.  There

6    are certain things I cannot help you with.  For

7    example, you may say:  Why didn't we see such and

8    such, we would like to see such and such.  What I will

9    say is:  You have got to decide the case based upon

10   what's on your plate, and not speculate as to what is

11   not before you.  Sometimes I'll get questions like:

12   Well, could you tell us what the second witness said

13   about such and such.  And I can't tell you that

14   because it's not my recollection.  I don't have the

15   ability to produce instant transcripts.  So I ask you

16   to rely on your collective recollections.  If you want

17   to see or hear the 911 tape or listen and watch the

18   surveillance again, let me know and we will bring you

19   back and let you do that.

20          Closings.

21          MS. RYAN:  Ladies and gentlemen, the judge

22   has just given you the jury instructions and the law

23   that applies to this case.  Nowhere in those jury

*IT is not a deadly weapon when it is closed*

135

1    instructions did you hear that it does not apply if it

2    is just a little knife. It is a little knife, but it

3    is a knife that is capable of doing exactly what it

4    was intended to do here by Mr. Cardone, which is to

5    make Letez Hudson in fear of imminent physical injury.

6    Letez Hudson backed up and fled when that was

7    displayed to him. That was Mr. Cardone's intent. He

8    confronted him with something that Mr. Hudson had no

9    idea about had even occurred the night before, but he

10   said: It was you, it was you that called the police

11   the night before at the Royal Farms when he had

12   urinated in public. He confronted Mr. Hudson and

13   intended to place him in fear of imminent physical

14   injury. Mr. Hudson testified he thought -- he was

15   afraid he was going to be stabbed. He ran. It's a

16   little knife. That's not being hidden from you.

17   That's what it is, but as little as it was, Mr.

18   Cardone's purpose and intent was to place Mr. Hudson

19   in fear of imminent physical injury and that's exactly

20   what he did: Displayed it. Mr. Hudson took off in a

21   matter of seconds and called 911. Despite the fact

22   Mr. Cardone had been told the night before by Officer

23   Judson not to return to Royal Farms, the management

*No that is not in test*
*in wong*
*Pg 58 in the state. I asked him if it was him or not that I stated what Pg or his closing*

*No, he didn't run His testimony was I backed away*

DAVID WASHINGTON
Official Court Reporter

1    did not want you there, do not come back, within 24

2    hours later, he comes back and confronts somebody that

3    has no idea what he was talking about.  He hears

4    something outside.  He checks what it is.  This is a

5    uniformed employee of Royal Farms.  Mr. Cardone

6    displays the knife to him.  The exact intent was to

7    make him fear he was about to be harmed with that

8    knife.

9        Mr. Abbott walks into a tense situation and

10   sees this going down, kind of observes the clerk who

11   appeared to been upset and Mr. Cardone saying:  I

12   don't care who you call, sees the same thing in his

13   hand, sees it in his right hand.  Officer Parsons told

14   you that he located the knife in Mr. Cardone's pocket,

15   the knife that has been entered into evidence.  You

16   will recall on the surveillance video, as Mr. Hudson

17   runs down the aisle, Mr. Cardone walks down that same  *No.*

18   aisle where Mr. Hudson just ran and turns and appears

19   to put something in his pocket and walks back to where

20   Mr. Abbott is by the coffee and walks out of the

21   store.  Moments later he is confronted by the police.

22   He has the same knife in his pocket.  He resisted  *NO*

23   arrest when the police try to tell him to pull the

*no, I resisted arrest because nobody arrested me I was under arrest*

DAVID WASHINGTON
Official Court Reporter

*They did not tell me I was being placed under arrest*

1   headphones down, put the coffee down and he doesn't

2   want to put his arms behind his back.

3           The State asks you to find him guilty of

4   possession of a deadly weapon during the commission of

5   a felony, the felony of aggravated menacing, and the

6   criminal trespass, which is for coming back to the

7   Royal Farms after he was told not to be there.  Thank

8   you.

9           THE COURT:  Mr. Abram.

10          MR. ABRAM:  Now I am here and I am second

11  again.  Unfortunately for me, I don't get the last

12  word.  She gets the chance to come back up and comment

13  on what I say.  She obviously will have an answer to

14  the little bit I have to say.

15          The question appears to be:  Was the knife

16  open.  You heard in the jury instructions the

17  definition of a deadly weapon.  It said a knife, but

18  not an ordinary, closed pocketknife.  The question is:

19  Was this pocketknife open.  You heard the testimony of

20  Mr. Hudson, who apparently had the knife near him, as

21  well as Mr. Abbott who was also in the store that had

22  the knife near him.  Neither one of them said it was

23  open.  Mr. Abbott said he didn't recall, he didn't

1   believe it was that way.  Mr. Hudson had no problem

2   saying this knife was not open.  As the officer here

3   stated, this knife, he says, is two inches.  You will

4   be able to take a look at this and be able to figure

5   out.  It's not.  It has to be at least three inches.

6   I'm not here to instruct you on the law.  That's what

7   the jury instructions are for.  You go back and refer

8   to them, refresh your recollection of what they are

9   and what the testimony was.  But I ask you to consider

10  the two people that were privy to this incident that

11  stated it was closed.  The only testimony you have it

12  was open comes from Officer Whitman.

13          Now, if you recall at another point in the

14  trial, the issue came up:  Where was the knife at.

15  Sergeant Parsons found the knife, said he found it

16  outside the 7-Eleven.  Officer Whitman in his report

17  stated it happened at the Rehoboth Beach Police

18  Department.  There is another inconsistency between

19  police officers.  The other inconsistency is between

20  direct witnesses and Officer Whitman.  All the

21  inconsistencies.  Officer Whitman is different from

22  the people that actually viewed these events.  In

23  order for you to find him guilty, you have to believe

DAVID WASHINGTON
Official Court Reporter

1    Officer Whitman on those.

2         You have also been advised about resisting

3    arrest.  As the jury instructions pointed out --

4    again, you will get a chance to see them again, you

5    don't have to take my word for it.  One of the

6    elements you have to find, you heard a lot of

7    testimony that Mr. Cardone was not necessarily

8    responsive, but I don't -- you have to recall if there

9    was any allegations of him actually fighting.  There

10   was no allegations he hit any officer, attempted to

11   hit an officer, kick an officer, punch an officer.  He

12   did none of that.  And the Judge informed you of the

13   common definition of that.  Attempted fighting is not

14   a definite definition in the jury instructions.  You

15   can see that.

16        The other count is a criminal trespass.  You

17   heard Officer Judson.  He informed Mr. Cardone he was

18   not welcome at Royal Farms.  You also heard Officer

19   Judson say he didn't put this down anywhere in

20   writing.  You also heard Mr. Hudson, the employee of

21   Royal Farms come in.  He asked Mr. Cardone if he could

22   help him with anything when he walked in.  He didn't

23   inform him he wasn't allowed in the store.  That

140.

*place ... on it has to be a court order*
*to prohibit a person from going into a public place.*

1    didn't happen.  He asked if he can help him with

2    anything.  So it is up to you to decide if he knew

3    that he was breaking the law in this regard.

4            I think I have just about covered everything

5    I wanted to cover today.  I wanted to make sure you

6    clearly read the jury instructions and follow the law

7    as instructed and compare the testimony of the

8    witnesses and determine who you believe to be the most

9    credible and base your verdict on that. *How can they compare*

10           THE COURT:  Rebuttal. *the testimony of Grимs said he*
*Cannot provide testimony.*

11           MS. RYAN:  Mr. Abram asked you to answer a

12   couple of questions.  The last question he asked you

13   was about the criminal trespass.  He said that

14   Mr. Hudson went up and asked if he can help him.  That

15   charge doesn't depend on what Mr. Hudson knew.

16   Mr. Hudson hadn't been there the night before.  He

17   didn't know that Mr. Cardone had been told not to come

18   back.  The important part is Mr. Cardone knew that he

19   wasn't supposed to be there because he was told by

20   Officer Judson the night before:  Do not go back to

21   Royal Farms, the management does not want you back

22   there.  It isn't what Letez Hudson knew.  He was doing

23   his job and approached a customer that appeared needed

DAVID WASHINGTON
Official Court Reporter

*public places*
*need a written*
*court order to*
*stay out*

1   help.  It's what Mr. Cardone knew for the criminal

2   trespass.

3           The other big question is:  Was the knife

4   open.  In answering that question, the Judge mentioned

5   to you circumstantial evidence.  I ask you to consider

6   in answering that question -- about was that knife

7   open -- the two people that testified they thought it

8   was a knife.  Now, if you had it in your hand, this

9   item you couldn't even see it, but you had the blade

10  open, you could see it was a knife, two people had the

11  impression it was a knife that was displayed, both Mr.

12  Abbott and Mr. Hudson.  If you are also concerned

13  about whether or not that blade was open, look at the

14  reaction of Letez Hudson.  In a matter of seconds,

15  8:43:02, he backs up.  8:43:03, a defensive stance.

16  8:43:04, if Mr. Cardone just had that pocketknife

17  closed in his hand, you could barely see it, what

18  would Mr. Hudson had done?  The next second, 8:43:04,

19  running.  When asking yourself was the knife open,

20  think about the quick impression that the two people

21  had that saw it.  A knife.  Think about Mr. Hudson's

22  reaction to when he sees the knife.  And, again, it is

23  not the size of the knife that matters, it's the

DAVID WASHINGTON
Official Court Reporter

*She is lying to the jury about the testimony that says the knife was not open*

```
 1    intent of Mr. Cardone.  He intended to place Mr.

 2    Hudson in fear of imminent physical injury and he did

 3    exactly that.  Thank you.

 4              THE COURT:  All right.  I just want to double

 5    check.  It is ten minutes of four.  You will all have

 6    to start deliberating.  This is not, in any sense, a

 7    rush or beat the clock or anything of that nature.  I

 8    want you to take as much time as appropriate, but I

 9    wanted to make sure everybody can come back tomorrow

10    we told you it was a two-day case.  Is everybody okay

11    tomorrow?  If anybody cannot, put your hand up.

12              Ma'am, can I see you at the sidebar.

13              (Whereupon, counsel approached the bench and

14         the following proceedings were had:)

15              (Whereupon, Juror No. 11 approached the

16         bench.)

17              THE COURT:  Yes, ma'am?

18              JUROR No. 11:  My husband and I are the head

19    of a soup kitchen at our church.  Tomorrow is the last

20    day to serve to them.

21              THE COURT:  You were in the courtroom when I

22    said this case may go two days.  We announced it when

23    you began this morning.
```

DAVID WASHINGTON
Official Court Reporter

1          JUROR No. 11:  Yes, but I didn't realize it

2    was going to be two days like that.

3          THE COURT:  Well, what time tomorrow are you

4    doing this at church?

5          JUROR No. 11:  We start at 6:00 o'clock in

6    the morning and we go usually until 3:00 o'clock in

7    the afternoon.

8          THE COURT:  I'm still confused as to if you

9    knew this was a two-day trial --

10          JUROR No. 11:  Like I told the lady, this was

11    my first time ever doing this and I apologize.  When

12    you asked that question, I said to the lady next to

13    me, I guess I need to get up and explain to them, but

14    I don't know whether you would let me do that then.

15          THE COURT:  You need to come up and explain

16    it.

17          JUROR No. 11:  She said --  *should not have excused her*

18          THE COURT:  You should have come up.  I will

19    excuse you.  You may go home.

20          JUROR No. 11:  Thank you.

21          (Whereupon, Juror No. 11 was excused and let

22          the courtroom.)

23          THE COURT:  Exceptions?


DAVID WASHINGTON
Official Court Reporter

```
 1              MS. RYAN:  No.

 2              MR. ABRAM:  No.

 3              (Whereupon, counsel returned to the trial

 4         table and the following proceedings were had:)

 5              THE COURT:  All right.  Ms. Fletcher, you are

 6    now No. 11.  When you back in, you will sit in that

 7    seat, okay?  Okay, you can now begin your

 8    deliberations.

 9              I guess I better swear the bailiffs.

10              (Whereupon, the bailiffs were duly sworn.)

11              THE COURT:  Okay.  All right.  Now you can

12    begin deliberating.  If you want to hear the 911 tape

13    or observe the other things, we can bring you back in.

14    Just let the bailiff know, okay?

15              THE BAILIFF:  I apologize, Your Honor.  We

16    wanted to get the alternate out.

17              (Whereupon, the jury left the courtroom.)

18              THE COURT:  Any exceptions to the

19    instructions as given?

20              MS. RYAN:  No, Your Honor.

21              MR. ABRAM:  No, Your Honor.

22              THE COURT:  All right.  If you are going to

23    return to your offices, please make sure there is a
```

_why no objection_

DAVID WASHINGTON
Official Court Reporter

1    number the bailiff can reach you that someone will

2    pick up after hours.  I will probably keep them an

3    hour, an hour-and-a-half.

4         MS. RYAN:  For the record, which one is the

5    juror -- I am confused about the numbers.  Which one

6    left?

7         THE COURT:  The one that left was Judy

8    Griffith, the No. 11 spot, replaced with the

9    alternate, Ms. Fletcher, No. 2.

10        MS. RYAN:  I am confused because in the jury

11   profile, Judy Griffith is listed as white.

12        THE COURT:  I can't help you there.  Thank

13   you.

14        (Whereupon, Court stood in recess to await

15        the jury's verdict.  Following which, Court

16        reconvened and the following proceedings were

17        had:)

18        THE COURT:  All right.  Could you get the

19   jury.

20        THE BAILIFF:  Yes, sir.

21        (Whereupon, the jury returned to the

22        courtroom.)

23        THE BAILIFF:  Juror No. 4.

DAVID WASHINGTON
Official Court Reporter

```
 1              THE COURT:  Ladies and gentlemen, the bailiff

 2     tells me Juror 4 will read the verdicts.  Ladies and

 3     gentlemen, has the jury been able to reach a unanimous

 4     verdict on all counts?

 5              THE JURY:  Yes.

 6              THE COURT:  Madam Clerk, would you take the

 7     verdict from Juror No. 4.

 8              THE CLERK:  Mr. Foreman, please rise.  Has

 9     the jury agreed upon a verdict?

10              JUROR No. 4:  Yes.

11              THE CLERK:  Does the jury find the defendant

12     at the bar as to Count 1, possession of a deadly

13     weapon during the commission of a felony  guilty as

14     charged  or not guilty?        prejudicial

15              JUROR No. 4:  Not guilty.

16              THE CLERK:  As to Count 2, aggravated

17     menacing  guilty as charged  or not guilty?  prejudicial
                                                     assumes guilt
18              JUROR No. 4:  Guilty as charged.

19              THE CLERK:  As to Count 3, resisting arrest,

20     guilty as charged  or not guilty?

21              JUROR No. 4:  Guilty as charged.

22              THE CLERK:  As to Count 4, criminal trespass,

23     guilty as charged or not guilty?
```

DAVID WASHINGTON
Official Court Reporter

1          JUROR No. 4:  Guilty as charged.

2          THE CLERK:  Thank you.  Please be seated.

3   Members of the jury, hearken to the verdict as the

4   Court has recorded it, your foreman says you find the

5   defendant at the bar, as to Count 1, possession of a

6   deadly weapon during the commission of a felony, not

7   guilty, as to Count 2, aggravated menacing, guilty as

8   charged, as to Count 3, resisting arrest, guilty as

9   charged, as to Count 4, criminal trespass in the third

10  degree, guilty as charged, so say you all?

11         THE JURY:  Yes.

12         THE COURT:  Ladies and gentlemen, I thank you

13  very much for your service.  You all are excused.

14  Like I say, because of the craziness of the holidays,

15  you may have -- if you wanted it -- drawn the

16  short-service straw.  I think you have.  Like I say, I

17  am glad you were able to participate in one of our

18  trials.

19         THE BAILIFF:  They may want to call in

20  Tuesday night.

21         THE COURT:  For the Court of Common Pleas?

22         THE BAILIFF:  Yes, sir.

23         THE COURT:  You can get the instructions as

DAVID WASHINGTON
Official Court Reporter

1    you leave.  Thank you, all.  You all are excused.

2              (Whereupon, the jury was excused and left the

3         courtroom.)

4              THE COURT:  All right.  What sentencing date

5    are you using?

6              THE CLERK:  Either May 13th or May 27th.

7              THE COURT:  Let's use May 13th.

8              What is the defendant's priors, if any, for

9    purposes of bond review at this time, since right now

10   there is no mandatory time?

11             He has been incarcerated since September 7th?

12             MR. ABRAM:  Yes, Your Honor.

13             MS. RYAN:  Yes.  Just give me a second.

14   Mr. Cardone has a conviction and actually a pending

15   violation of probation from this court for assault in

16   the second degree, possession of a deadly weapon

17   during the commission of a felony, and that conviction

18   dates back to January of 2003.

19             THE COURT:  That is pending the disposition

20   of these charges?

21             MS. RYAN:  Yes.  It was attempted to be

22   resolved prior to the trial, but we were not able to

23   do that.  So that violation of probation --

DAVID WASHINGTON
Official Court Reporter

1          THE COURT:  Then the violation of probation

2     will be heard on that same day.

3          The new conviction is the basis for the

4     violation, Mr. Abram.

5          MR. ABRAM:  Your Honor, are we reviewing bond

6     today?

7          THE COURT:  That is what I am doing right

8     now.  This charge, in itself, let's call it a happy

9     ending as far as nobody getting hurt, but the behavior

10    as shown by this charge, in light of the fact he was

11    on probation for these other charges kind of knocks me

12    back a little bit.  I had been -- I raised it because

13    I was considering lowering the bond, but now I am kind

14    of on the other side of the fence.  You have to talk

15    to me.  I need to know your position.

16         MR. ABRAM:  Is there a separate bond set for

17    the VOP at this time?

18         THE COURT:  I expect there is a separate bond

19    on the VOP.  Right now, since he was convicted of

20    these charges, I will set new bond on these charges.

21         MR. ABRAM:  I think right now the current

22    bond of 42,500 cash --

23         THE COURT:  On these charges?

1          MR. ABRAM:  Yes.

2          THE COURT:  One of them he was found not

3    guilty.  It will be knocked down to a certain degree.

4    Anything else, counsel?

5          MR. ABRAM:  I guess there was no minimum

6    mandatory on the time he's got.  He's done seven

7    and-a-half months.  He has a violation of probation

8    pending.  The other two were misdemeanors.  I guess of

9    the bad charges, he ended up on the better end of the

10   charges today.  And given another big bond potentially

11   for the VOP, I think that 42,500 cash right now is

12   very excessive.

13         THE COURT:  But the violations of probation

14   are assault second and weapons, felony charges.

15         MR. ABRAM:  Yes.  I believe he has nine years

16   backed up on this.

17         THE COURT:  I will revoke bond on these

18   charges right here.  I think it's best Mr. Cardone not

19   get out between now and sentencing so we can take a

20   good look at him through a presentence investigation

21   and I think that will be most helpful to him.  I think

22   in the long run, it may be helpful to Mr. Cardone.

23   Okay.  Thank you, all.


DAVID WASHINGTON
Official Court Reporter

1              (Whereupon, the proceedings in the

2         above-entitled matter concluded.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

C E R T I F I C A T E

I, DAVID WASHINGTON, an Official Court
Reporter of the Superior Court of Delaware,
Certification #121-PS, do hereby certify the above and
foregoing pages, 3 though 150, to be a true and
accurate transcript of the proceedings therein indicated
on Monday, March 28, 2005, as was
stenographically reported by me and reduced to computer-aided
transcript under my direct supervision, as the same remains
of record in the Sussex County Courthouse,
Prothonotary's Office, Georgetown, Delaware.

_____
David Washington

Oct. 21, 2005
_____
Date

DAVID WASHINGTON
Official Court Reporter